Amos KAUFFMAN

v.

**The PENNSYLVANIA SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS, et al.**

**Civil Action No. 10–2504.**

United States District Court,
E.D. Pennsylvania.

Feb. 16, 2011.

---

**558**

David R. Dye, Leonard G. Brown, III, Clymer & Musser, P.C., Lancaster, PA, for Plaintiff.

Joseph J. Santarone, Jr., Marshall Dennehey Warner Coleman & Goggin, King of Prussia, PA, for Defendant.

### MEMORANDUM

DALZELL, District Judge.

Plaintiff Amos Kauffman ("Kauffman") sues The Pennsylvania Society for the Prevention of Cruelty to Animals ("PSPCA") and two of its employees, Ashley Mutch ("Mutch") and Kristen Sullivan ("Sullivan"), alleging civil rights violations under 42 U.S.C. § 1983 and a common law claim for conversion. This suit arises out of Mutch's investigation of Kauffman's farm on November 23, 2009, Mutch and Sullivan's seizure a day later of animals from the farm pursuant to a search warrant, and defendants' refusal to return these animals to Kauffman after the dismissal of state animal cruelty charges against him.

Kauffman contends that all three defendants violated § 1983 by unconstitutionally seizing his property, searching his farm, and failing properly to train Mutch and Sullivan. Kauffman also asserts that all three defendants committed the tort of conversion by depriving him of his property, and that he is entitled to a declaratory judgment that defendants unconstitutionally searched and seized his property.

The defendants urge us to dismiss Kauffman's § 1983 claims pursuant to Rule 12(b)(6) because (1) when Mutch and Sullivan seized Kauffman's property, they acted pursuant to a valid search warrant; (2) Mutch and Sullivan are entitled to qualified immunity; and (3) Kauffman has not successfully asserted a *Monell* claim against the PSPCA for failure to train or supervise. As will be seen, defendants' second contention takes us into largely uncharted waters. In the end we grant defendants' motion to dismiss in part and

deny it in part. We also will order Kauffman to explain how the investigation of his farm violated the Fourth Amendment and how he has availed himself of the processes Pennsylvania affords him to retrieve his property.

### I. *Factual Background*

In evaluating a motion to dismiss under Fed.R.Civ.P. 12(b)(6), we must "accept all factual allegations in the complaint as true and give the pleader the benefit of all reasonable inferences that can be fairly drawn therefrom." *Ordonez v. Yost*, 289 Fed.Appx. 553, 554 (3d Cir.2008) (quoting *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir.1993)). In deciding such motions, courts may "consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim," *Brown v. Daniels*, 128 Fed.Appx. 910, 913 (3d Cir.2005) (quoting *Lum v. Bank of America*, 361 F.3d 217, 222 n. 3 (3d Cir. 2004)) (internal quotation marks omitted), where a document forms the basis of a claim if it is "integral to or explicitly relied upon in the complaint." *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997)) (emphasis omitted). We will thus rehearse the facts Kauffman alleges in his complaint as well as other relevant facts drawn from exhibits attached to that complaint and found in the public record.

Kauffman is a farmer in Chester County, Pennsylvania, Pl.'s Compl. ¶ 8. Kauffman and his family have long operated a dairy farm and greenhouse there. *Id.* ¶ 15. Throughout Kauffman's lifetime as a farmer, he and his family have kept pet dogs and cats on their property. *Id.* ¶ 16. While Kauffman has occasionally sold puppies to members of his community, he has never operated a kennel or applied for a kennel license because the number of dogs

on his property has never exceeded twenty-five. *Id.* ¶ 17.

The PSPCA is a non-profit corporation organized under the laws of the Commonwealth of Pennsylvania. *Id.* ¶ 9. It enforces Pennsylvania's laws dealing with criminal cruelty to animals through its humane society police officers.[1] *Id.* At all times relevant to this action, the PSPCA employed Mutch and Sullivan as humane society police officers, with Sullivan in a supervisory capacity. *Id.* ¶¶ 11–12.

In November of 2009, the Kauffman family had several dogs and one cat on their farm, including an adult male and adult female Chihuahua and a female German shepherd. "[T]wo of the Kauffman family dogs, the Chihuahua and Shepherd had a litter of puppies," and the Kauffmans sold "a couple puppies" to others in their community. *Id.* ¶ 19.

According to Kauffman, on November 11, 2009, Mutch "purportedly received a complaint about 'sick puppies' being sold by Amos Kauffman," and on November 23, 2009 Mutch "purportedly went 'undercover' to the Kauffman farm and observed five puppies living in a pen that, incredibly, smelled of urine and feces."[2] *Id.* ¶¶ 20–21. Another individual, whom Kauffman identifies only as Mutch's "sidekick," accompanied Mutch to Kauffman's farm. *Id.* ¶ 22.

Both Mutch and this "sidekick" "lied to Mr. Kauffman about the true intent of their visit," and during the twenty minutes they spent at the farm neither voiced any complaints about the conditions of the animals they observed. *Id.* ¶¶ 22–23.

Mutch bought four puppies from Kauffman on November 23, 2009 and took them to the PSPCA headquarters, and later that same day veterinarian Kim Russell of the PSPCA examined the puppies—again, "purportedly"—and found them to be anemic and to have parasites, with one puppy suffering from ringworm. *Id.* ¶¶ 21, 24. On November 24, 2009, after securing the approval of Assistant District Attorney Lauren Dentone, Mutch obtained a warrant from a magistrate judge to search the Kauffman property and seize "all animals . . . and any/all proof of ownership of animals and/or medical records/supplies for animals and/or residence." Ex. 3 to Pl.'s Compl. at 1. The magistrate judge issued the warrant based on Mutch's affidavit of probable cause, which reviewed Mutch's training, qualifications, and employment with the PSPCA, described the phone call Mutch had received reporting "sick puppies" at the Kauffman property, recounted Mutch's visit to Kauffman's farm and her observation of "puppies living in a pen that had fecal matter and smelled of feces and

---

1. Specifically, under 18 Pa. Cons.Stat. § 5511(i), "[a]n agent of any society or association for the prevention of cruelty to animals, incorporated under the laws of the Commonwealth, shall have the same powers to initiate criminal proceedings provided for police officers by the Pennsylvania Rules of Criminal Procedure," where § 5511 generally deals with "[c]ruelty to animals."

2. Kauffman does not make clear what he means here by "purportedly" and "incredibly." Kauffman does not deny that Mutch received a complaint, went to the Kauffman farm, or that she observed puppies living in a pen that smelled of urine and feces, but he does use one word, "purportedly," that suggests skepticism, and another, "incredibly", that may suggest either skepticism or amazement. VII *Oxford English Dictionary* 829 (2d ed.1989) (defining *incredibly* as "in a way or to an extent that is impossible or very difficult to believe; to an extent that one would not have believed possible"). We are unsure what legal import Kauffman means the tone of these expressions to have. In any event, given that one of the counts asserted in Kauffman's complaint is predicated upon an event—Mutch's undercover search—that Kauffman suggests only "purportedly" took place, we will ignore Kauffman's attitudinal adverbs here, and take Kauffman's complaint to mean he does not deny that these events happened.

urine," and explained the results of Russell's veterinary examination of the purchased puppies. *Id.* at 2. On November 24, 2009, Mutch and Sullivan arrived at Kauffman's farm armed with weapons and dressed in uniform. They identified themselves as humane society police officers. Pl.'s Compl. ¶ 26. They then seized "all the family pets along with the file folders for the dogs, rabies records, dog food receipts, and a notebook." *Id.* ¶ 27.

Mutch charged Kauffman with ten counts of animal cruelty, alleging that Kauffman's animals had overgrown nails and fleas and that Kauffman kept unclean pens. *Id.* ¶ 28. On March 25, 2010, "[a]ll of the charges brought by Mutch were dismissed at the district justice level." *Id.* ¶ 34. Though the charges have been dismissed, the defendants have refused to return the seized animals to the Kauffmans, instead threatening them with fines unless they leave the animals with the PSPCA. *Id.* ¶ 35.

## II. *Analysis*

As already noted, Kauffman asserts five counts, with each count directed at all three defendants: (1) a declaratory judgment that defendants unconstitutionally searched and seized Kauffman's property; (2) unconstitutional seizure in violation of the Fourth Amendment and § 1983; (3) unconstitutional search in violation of the Fourth Amendment and § 1983; (4) inadequate training and supervision in violation of § 1983; and (5) state common law conversion. Defendants move under Fed. R.Civ.P. 12(b)(6) to dismiss Counts II, III, and IV of Kauffman's complaint.

As a prefatory matter, we note that while Fed.R.Civ.P. 8(a)(3) provides that "[a] pleading that states a claim for relief must contain … a demand for the relief sought, which may include relief in the alternative or different types of relief," "the pleader need only make one demand for relief regardless of the number of claims that are asserted." 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1255 (3d ed.2008). The relief a plaintiff seeks, and the claims he asserts, are thus conceptually distinct components of a complaint, and there is no need for a plaintiff to devote a separate count of a complaint to a request for a certain type of relief, as Kauffman does in seeking a declaratory judgment under Count I. Such belt-and-suspenders pleading is particularly inapt when the plaintiff includes an application for the claimed relief in his concluding prayer for relief, as Kauffman does here. Pl.'s Compl. at 13 ("[P]laintiff prays that [t]his honorable court declare that the actions of defendants to be [*sic*] in violation of the Fourth Amendment to the United States Constitution.") We will thus dismiss Count I of the complaint as redundant and not in conformity with Rule 8(a)(3).

As to Rule 12(b)(6), "[t]he test in reviewing a motion to dismiss for failure to state a claim is whether, under any reasonable reading of the pleadings, [the] plaintiff may be entitled to relief." *Kundratic v. Thomas*, 407 Fed.Appx. 625, 627, 2011 WL 208636, at *1 (3d Cir.2011) (brackets in original) (quoting *Holder v. City of Allentown*, 987 F.2d 188, 194 (3d Cir.1993)), and "the defendant bears the burden of showing that no claim has been presented." *Hedges v. U.S.*, 404 F.3d 744, 750 (3d Cir.2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir.1991)).

"[A] complaint's 'factual allegations must be enough to raise a right to relief above the speculative level,'" *Ideen v. Straub*, 385 Fed.Appx. 123, 124 (3d Cir.2010) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)), and "must not be 'so undeveloped that [the complaint] does not provide

a defendant the type of notice of claim which is contemplated by [Fed.R.Civ.P. 8].'" *Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir.2008) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir.2008)). Thus, a pleading may not simply offer "labels and conclusions," *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, — U.S. —, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). Moreover, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950. This standard is not as demanding as a "probability requirement," but a plaintiff must allege facts sufficient to show that there is "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 1949 (internal quotation marks omitted).

A defendant may therefore succeed on a Rule 12(b)(6) motion by showing that the factual allegations in a plaintiff's complaint do not state a plausible claim for relief. Pertinent to qualified immunity, a defendant may raise an affirmative defense "on a Rule 12(b)(6) motion if the predicate establishing the defense is apparent from the face of the complaint." *Bethel v. Jendoco Constr'n Corp.*, 570 F.2d 1168, 1174 n. 10 (3d Cir.1978).

### A. *Counts II, III, & IV: PSPCA's Organizational Liability*

For convenience, we will address the counts of Kauffman's complaint in reverse order, beginning with Count IV. Under this count, Kauffman advances a claim for "inadequate training and supervision" under § 1983 against the PSPCA, Mutch, and Sullivan, arguing that (1) "[d]efendant PSPCA despite its duty to do so, failed to provide sufficient or adequate training and education," Pl.'s Compl. ¶ 53; (2) "[t]he actions of Defendant PSPCA constituted part of a pattern and practice of unlawful

and improper behavior," *id.* ¶ 55; and (3) "[a]s a result of defendants' malicious conduct, Plaintiff has been injured and deprived of due process of law, his right to be free from unconstitutional search and seizure and his property." *Id.* ¶ 56.

Defendants respond that "[p]laintiff has identified no such custom, practice or policy" justifying *Monell* liability, Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' MTD Memo") at 10, and that since Kauffman "ha[s] not alleged that individual Defendants Sullivan and Mutch had any policy-making authority, the *Monell* claims against these individual Defendants, should be dismissed." *Id.* at 12. Kauffman replies that "the PSPCA is not a government agency, entity or a municipal unit. Therefore, *Monell* is inapplicable, and the PSPCA can be held vicariously liable for the actions of its agents and employees." Pl.'s Resp. to Defs.' Mot. to Dismiss ("Pl.'s Resp.") at 15.

■ We must grant defendants' request that we dismiss Count IV with respect to Sullivan and Mutch as Kauffman fails to mention either Sullivan or Mutch in Count IV, much less allege that either was responsible for a failure to train or supervise (presumably, themselves). We therefore turn to the PSPCA's liability under Count IV.

Under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Kauffman rejects the proposition that *Monell* applies to other private organizations faced with liability

562

under § 1983. In support of this position, Kauffman cites two opinions in which our Court of Appeals "appl[ied] *Monell* to private entities acting under the color of state law" while also taking that Court to task because it "failed to provide detailed analysis of its extension of vicarious liability protection to private entities, and the cases it cites do not support the proposition." Pl.'s Resp. at 16.

■ Kauffman first quotes *Regan v. Upper Darby Twp.*, 363 Fed.Appx. 917, 922 (3d Cir.2010) (internal quotation marks and brackets omitted), where our Court of Appeals concluded that a "private entity that is a state actor may not be held vicariously liable under § 1983 for the actions of its agents because there is no *respondeat superior* theory of municipal liability." He next cites *Natale v. Camden County Correctional Facility*, 318 F.3d 575, 583–84 (3d Cir.2003), where the Court found that "[i]n order for PHS [a private healthcare provider] to be liable, the Natales must provide evidence that there was a relevant PHS policy or custom, and that the policy caused the constitutional violation they allege." Despite Kauffman's disagreement with our Court of Appeals, we will follow the Court's guidance as we are obliged to do.

In the first place, the opinions Kauffman cites are *not* anomalous. Our Court of Appeals has consistently rejected *respondeat superior* liability and established *Monell* as the only basis for organizational liability under § 1983. Thus, in *Dubois v. Vargas*, 148 Fed.Appx. 111, 113–14 (3d Cir.

2005) (citation omitted), our Court of Appeals explained that "liability under 42 U.S.C. § 1983 cannot be based solely upon the doctrine of respondeat superior. In order to establish liability [against an organization], Dubois would have to present evidence that Vargas's actions were the result of some relevant organizational policy or custom, the implementation of which resulted in a violation of Dubois's constitutional rights." And in *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1155 (3d Cir.1995), our Court of Appeals applied *Monell* to a § 1983 action against a volunteer fire company, refusing to impose liability because the defendant "did not enact a policy evincing willful disregard or deliberate indifference to plaintiff's rights." We therefore reject Kauffman's assertion of a *respondeat superior* theory of liability against the PSPCA under § 1983.[3]

■ To judge whether Kauffman has stated a claim against the PSPCA under Count IV, then, we must first consider whether he has alleged a policy or custom. Kauffman baldly asserts that "[t]he actions of Defendant PSPCA constituted part of a pattern and practice of unlawful and improper behavior," Pl.'s Compl. ¶ 55, but provides *no* factual averments supporting his assertion. Ignoring, as we must, "mere conclusory statements," *Iqbal*, 129 S.Ct. at 1949, we cannot conclude that Kauffman has stated a claim for organizational liability under § 1983 against the PSPCA. We therefore will dismiss Count IV in its entirety.

**3.** It appears that Kauffman drafted his complaint believing that *Monell* applied to his § 1983 claim against the PSPCA, and only later concluded that a vicarious liability theory was also available. As the Supreme Court explained in *Monell*, 436 U.S. at 692, 98 S.Ct. 2018, vicarious liability permits a plaintiff "to impose liability vicariously ... solely on the basis of the existence of an employer-employee relationship with a tortfeasor." If Kauff-

man believed from the start that he could succeed on a vicarious liability theory under § 1983, it seems odd that he would plead the PSPCA's failure to train and supervise in his complaint, and then further allege a "pattern and practice of unlawful and improper behavior" by the PSPCA, Pl.'s Compl. ¶ 55, when it would have been far easier merely to allege an employer-employee relationship between the PSPCA and Mutch and Sullivan.

In Counts II and III, Kauffman alleges unconstitutional seizures and searches in violation of the Fourth Amendment and § 1983. Confusingly, Kauffman asserts Counts II and III not only against Mutch and Sullivan, but also against the PSPCA. As we have explained, Kauffman may not state a § 1983 claim against the PSPCA based on vicarious liability, and he alleges no custom or policy on the part of the PSPCA leading to the violations asserted in Counts II and III. We will therefore dismiss the claims against the PSPCA under Counts II and III, and consider these counts only as they relate to Sullivan and Mutch.

**B. *Count III: Defendants' Claim of Qualified Immunity***

In Count III, Kauffman alleges that "[d]efendants operated on November 23, 2009, when they 'went undercover' without the knowledge or supervision of any law enforcement officer in Chester County or any other part of the Commonwealth," and that "[d]efendants' ruse and failure to advise plaintiffs of the invasion of the government into their home is a violation of the [*sic*] Mr. Kauffman's rights to be free from unconstitutional searches." Pl.'s Compl. ¶¶ 50–51. Defendants respond that "Sullivan and Mutch are entitled to qualified immunity, for their investigation of suspected animal cruelty pursuant to 18 Pa.C.S. § 5511. Should it be determined that Plaintiff's Exhibit 3 is somehow defective, the officers are nonetheless entitled to qualified immunity, as Plaintiff's exhibit, is a facially valid warrant, pursuant to which the Officers were acting." Defs.' MTD Memo at 6. Kauffman responds that the defendants "are not entitled to qualified immunity." Pl.'s Resp. at 10.

The defendants seem to misapprehend Kauffman's argument under Count III. That Count alleges not that the defendants performed an unconstitutional search on November 24, 2009—when Mutch and Sullivan searched Kauffman's property pursuant to a search warrant—but that such a violation occurred on November 23, 2009, when Mutch visited Kauffman's farm "undercover." Despite defendants' misreading of Count III, we may nevertheless consider whether the defendants are entitled to a defense of qualified immunity for the November 23, 2009 "search."

Our Court of Appeals has not yet determined whether officers of humane societies may claim qualified immunity when they carry out law enforcement functions. Those district courts within our Circuit that have considered the question have ultimately declined to rule on it. *See Allen v. Pa. Soc'y for Prevention of Cruelty to Animals,* 488 F.Supp.2d 450, 468 n. 17 (M.D.Pa.2007) (deciding that "absent more compelling record evidence, the court is unable to conclude that [a PSPCA officer] is entitled to either absolute or qualified immunity"); *Taylor v. North,* 1996 WL 482985, at *3 (E.D.Pa.1996) (finding that the Montgomery County SPCA and one of its officers' "conduct is clearly not protected by qualified immunity" without considering whether the defendants could be entitled to the defense). This is therefore a matter of first impression in our Circuit, and thus we must return to first principles to resolve it.

The Supreme Court in recent times has decided two cases involving the assertion of the qualified immunity defense by private defendants, *Wyatt v. Cole,* 504 U.S. 158, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992), and *Richardson v. McKnight,* 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997). In *Wyatt,* the Court examined "whether qualified immunity, as enunciated in *Harlow* [*v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ] is available for private defendants faced with § 1983 liability for invoking a state replevin, garnishment, or attachment statute," and found "[t]hat answer is no." 504 U.S.

at 168–69, 112 S.Ct. 1827. In *Richardson,* it concluded that "private prison guards, unlike those who work directly for the government, do not enjoy immunity from suit in a § 1983 case." 521 U.S. at 412, 117 S.Ct. 2100. While *Wyatt* bluntly stated that the rationales supporting qualified immunity "are not transferable to private parties," 504 U.S. at 168, 112 S.Ct. 1827, *Richardson* explained that "*Wyatt* did not consider its answer to the question before it as one applicable to *all* private individuals." 521 U.S. at 404, 117 S.Ct. 2100 (emphasis in original). To determine whether PSPCA officers may be entitled to qualified immunity from suit under § 1983 when they assist in law enforcement, we must follow *Wyatt*'s teaching that:

> [W]e have accorded certain government officials either absolute or qualified immunity from suit if the tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that Congress would have specifically so provided had it wished to abolish the doctrine. If parties seeking immunity were shielded from tort liability when Congress enacted the Civil Rights Act of 1871– § 1 of which is codified at 42 U.S.C. § 1983–we infer from legislative silence that Congress did not intend to abrogate such immunities when it imposed liability for actions taken under color of state law. Additionally, irrespective of the common law support, we will not recognize an immunity available at common law if § 1983's history or purpose counsel against applying it in § 1983 actions.

504 U.S. at 164, 112 S.Ct. 1827 (internal quotation marks and citations omitted).

It seems clear under *Wyatt* that whether qualified immunity for particular defendants existed at common law in 1871 is the threshold inquiry that must take place before any investigation of whether such immunity would comport with § 1983's history or purpose. The statement in *Richardson* that we must "look both to history *and* to the purposes that underlie government employee immunity in order to find the answer," 521 U.S. at 404, 117 S.Ct. 2100 (emphasis added), and *Richardson*'s exploration of the immunity doctrine's purposes after finding "no conclusive evidence of a historical tradition of immunity," *id.* at 407, 117 S.Ct. 2100, are not to the contrary. *Richardson* quoted language from *Wyatt* suggesting that both common law support and consonance with § 1983's purposes are prerequisites for qualified immunity: "[T]his Court has nonetheless accorded immunity where a " 'tradition of immunity was so firmly rooted in the common law *and* was supported by such strong policy reasons that 'Congress would have specifically so provided had it wished to abolish the doctrine.' " ' " *Id.* at 403, 117 S.Ct. 2100 (emphasis added) (quoting *Wyatt,* 504 U.S. at 164, 112 S.Ct. 1827 (quoting *Owen v. City of Independence,* 445 U.S. 622, 627, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) (quoting *Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)))). And *Richardson*'s examination of both the common law and the immunity's purposes may be ascribed to the Court's thoroughness and not to any intent to revise *Wyatt*'s test.

We have found no support in the common law for a qualified immunity defense to humane society officers applicable in 1871. Indeed, our research reveals not one case concerning a humane society or a society for the prevention of cruelty to animals that predates 1871. This is not surprising in view of the reality that the PSPCA only came into being in 1868 [4] and

---

**4.** As the Supreme Court of Pennsylvania has explained, quoting the Act of 1868, P.L. 615, the Pennsylvania General Assembly created the SPCA " 'to provide effective means for the prevention of cruelty to animals throughout the state of Pennsylvania, and for the enforce-

that it is not unlikely that other such societies were not established until after 1871. We therefore conclude that qualified immunity is not generally available to officers of humane societies when they enforce animal cruelty laws.[5]

One last argument remains with respect to qualified immunity. In *Richardson,* the Supreme Court cautioned that "we have answered the immunity question narrowly, in the context in which it arose.... The case does not involve a private individual briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision." 521 U.S. at 413, 117 S.Ct. 2100. In a case where it did, Judge Caputo has concluded that the private firm Pennsylvania Power & Light

Company ("PP & L") was entitled to qualified immunity from suit under § 1983 when city officials "contacted PP & L ... and requested that power to Plaintiff's building be suspended," since PP & L was "a private business serving as an adjunct to the local government in an essential government activity, and acting under close governmental supervision." *Gardner v. McGroarty,* 2002 WL 32107213, at *3, *8 (M.D.Pa.2002). Under 22 Pa. Cons.Stat. § 3710, "all search warrant applications filed in connection with alleged violations of cruelty to animals laws must have the approval of the district attorney in the county of the alleged offense prior to filing," and Mutch in fact got the approval of an assistant district attorney before submitting her search warrant application to a

---

ment of all laws heretofore or hereafter enacted for the protection of dumb animals.'" *Snead v. SPCA of Pennsylvania,* 604 Pa. 166, 985 A.2d 909, 912 (2009).

**5.** While the lack of support in the common law for qualified immunity for humane society officers demonstrates, without need for further inquiry, that such officers may not claim qualified immunity, we note that were our determination to turn only on the conformity of such a grant with the purposes of § 1983, it might necessitate a different result. The Supreme Court explained in *Wyatt* that "we have recognized qualified immunity for government officials where it was necessary to preserve their ability to serve the public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service." 504 U.S. at 167, 112 S.Ct. 1827. *Wyatt*'s holding was based in part on the contention that "private parties hold no office requiring them to exercise discretion; nor are they principally concerned with enhancing the public good." *Id.* at 168, 112 S.Ct. 1827. *Richardson* took a more nuanced approach to the public policy inquiry, concluding only that qualified immunity is not available when "a private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertakes that task for profit and potentially in competition with other

firms." 521 U.S. at 413, 117 S.Ct. 2100. *Richardson* grounded this holding in its observations that "marketplace pressures provide the private firm with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or 'nonarduous' employee job performance," *id.* at 410, 117 S.Ct. 2100, and that "'privatization' helps to meet the immunity-related need 'to ensure that talented candidates' are 'not deterred by the threat of damages suits from entering public service' .... in part because of the comprehensive insurance-coverage requirements just mentioned." *Id.* at 411, 117 S.Ct. 2100 (quoting *Wyatt,* 504 U.S. at 167, 112 S.Ct. 1827).

To be sure, (1) the PSPCA does not appear to be a private firm participating in a competitive market; (2) we have not been apprised of any insurance-coverage requirement applying to humane societies; (3) PSPCA officers clearly exercise some discretion in enforcing the law; and (4) judging from the Pennsylvania law establishing the PSPCA, it is indeed an organization "principally concerned with enhancing the public good," 504 U.S. at 168, 112 S.Ct. 1827. Thus, the rationales advanced in *Wyatt* and *Richardson* for qualified immunity might well apply to the PSPCA and its officers. Nonetheless, the dearth of support in the common law for qualified immunity on the part of humane society officers leads us to withhold its grace under § 1983.

566

magistrate judge. Ex. 3 to Pl.'s Compl. at 2. Mutch and Sullivan, therefore, may well be entitled to qualified immunity with respect to their execution of the search warrant on November 24, 2009—a point we will revisit in the next section when we deal with Count II.

█ Kauffman alleges, however, that "[d]efendants operated on November 23, 2009, when they 'went undercover' without the knowledge or supervision of any law enforcement officer in Chester County or any other part of the Commonwealth." Pl. Compl. ¶ 50. Taking Kauffman's allegations as true in ruling on defendants' motion to dismiss, we cannot conclude that Mutch on November 23, 2009 "act[ed] under close official supervision," *Richardson*, 521 U.S. at 413, 117 S.Ct. 2100, when she visited Kauffman's property. And while the investigation of animal cruelty crimes certainly furthers an important governmental purpose, we cannot determine that Mutch "serv[ed] as an adjunct to government in an essential governmental activity," *id.*, in investigating alleged crimes at the Kauffman farm. The mere investigation of crimes by a private citizen, without the request or supervision of a government official, does not by itself make that person an adjunct of the government. The defense of qualified immunity, then, does not extend to Mutch's "undercover" visit to Kauffman's farm on November 23, 2009.

### C. *Count III: Plaintiff's Failure to State a Claim*

█ Though no qualified immunity is available to the defendants with respect to Count III of Kauffman's complaint, we remain unconvinced that Kauffman has stated a claim under § 1983. To state a claim under § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under

color of state law." *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). The Supreme Court has observed that "[i]n cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment," *United States v. Price*, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966), and has "found state action present in the exercise by a private entity of powers traditionally exclusively reserved to the State." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Kauffman states that Mutch carried out an undercover search of his property on November 23, 2009 pursuant to 18 Pa. Cons.Stat. § 5511(i); he has thus alleged that Mutch exercised "powers traditionally exclusively reserved to the State." *See also Allen*, 488 F.Supp.2d at 462 (finding that the PSPCA and humane society police officers "satisfy the 'acting under color of state law' requirement"). Whether Kauffman has alleged that Mutch "violat[ed] a right secured by the Constitution and laws of the United States," *West*, 487 U.S. at 48, 108 S.Ct. 2250, is far less clear, and Kauffman has alleged *no* violation of any sort by Sullivan under Count III.

The Supreme Court has explained that "[a] government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant. Of course, this does not mean that, whenever entry is obtained by invitation and the locus is characterized as a place of business, an agent is authorized to conduct a general search for incriminating materials." *Lewis v. United States*, 385 U.S. 206, 211, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966). *See also United States v. Baldwin*, 621 F.2d 251 (6th Cir.1980), *cert. denied*, 450 U.S. 1045, 1045, 101 S.Ct. 1767, 68 L.Ed.2d 244 (1981) (rejecting Fourth Amendment challenge

where undercover police officer gained defendant's confidence, obtained employment as his chauffeur and general handyman, and took evidence from his home); *United States v. Butler*, 405 Fed.Appx. 652, 656, 2010 WL 5416790, at *4 (3d Cir.2010) ("It is therefore clear that officers may seek citizens' consent in investigating crimes, and that officers need not always announce their true identities when they do so.").

██ From Kauffman's complaint, we are told that Mutch and "her sidekick" obtained Kauffman's consent to visit his farm, purchased several puppies while on the property, and left after less than twenty minutes. Pl.'s Compl. ¶¶ 21–23. Kauffman does not allege that Mutch took any property from him or conducted any search of the property without his consent. The jurisprudence suggests that Kauffman has not alleged the "violation of a right secured by the Constitution and laws of the United States," *West*, 487 U.S. at 48, 108 S.Ct. 2250, and hence he has failed to state a § 1983 claim for unconstitutional search. We likewise note that Kauffman's complaint fails to allege any involvement by Sullivan in the November 23, 2009 "search," though Kauffman also asserts his claims in Count III against Sullivan.

██ We are mindful that defendants in their motion did not raise Kauffman's failure to allege the violation of a right under Count III of his complaint, or his failure to state a claim against Sullivan under that count. *"Sua sponte* dismissal of a claim is disfavored and inappropriate unless the basis for dismissal is apparent from the face of the complaint," *Giles v. Volvo Trucks N. Am.*, 551 F.Supp.2d 359, 369 (M.D.Pa.2008) (Kane, C.J.) (citing *Ray v. Kertes*, 285 F.3d 287, 297 (3d Cir.2002)), and "[b]efore *sua sponte* dismissal is appropriate . . . a Court must give a plaintiff notice and an opportunity to be heard on the legal viability of his complaint." *Id.* (citing *Dougherty v. Harper's Magazine*

*Co.*, 537 F.2d 758, 761 (3d Cir.1976)). We will thus afford Kauffman leave to file a brief explaining how his complaint alleges a Fourth Amendment violation under Count III in light of the cited jurisprudence.

### D. *Count II: Defendants' Claim of Qualified Immunity*

Kauffman asserts that the defendants unconstitutionally seized his property in violation of the Fourth Amendment and 42 U.S.C. § 1983 because "[d]efendants seized plaintiff's property and continue to refuse to return plaintiff's property without probable case [*sic*] and brought charges against Amos Kauffman without probable cause." Pl.'s Compl. ¶ 44. In support of this claim, Kauffman first argues that "[p]laintiff had demonstrated an unconditional willingness to cooperate in resolving any potential or perceived problems and had been treating the animals through services of veterinarians," and contends further that "[e]ven assuming that the facts contained in the affidavit of Mutch are true, there is no probable cause to arrest, cite or seize property based on the assertions in the warrant as nothing supports a violation of the animal cruelty laws and any reasonable well-trained officer would have recognized that the search was illegal." *Id.* ¶¶ 43, 46.

Defendants respond that "Sullivan and Mutch are entitled to qualified immunity, for their investigation of suspected animal cruelty pursuant to 18 Pa.C.S. § 5511." Defs. MTD Memo at 6. They further assert that "[p]laintiff would have the Court hold that the Humane Society Police Officers who were present at his home acted illegally in serving the warrant. To so find, the Court would have to invalidate the warrant itself. Given the undeniable preference for law enforcement to obtain a warrant, the individual SPCA Humane So-

ciety Officers acted reasonably, and legally, in doing so, here." *Id.* at 4. Kauffman counters that Sullivan and Mutch "are not entitled to qualified immunity," Pl.'s Resp. at 10, and that their "argument flies in the face of Fourth Amendment jurisprudence, which clearly allows for the challenge of an already-existing warrant." *Id.* at 6.

Given that "qualified immunity is in part an entitlement not to be forced to litigate the consequences of official conduct," *Mitchell v. Forsyth,* 472 U.S. 511, 527, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), a court should address the issue "at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). We will thus first consider whether Sullivan and Mutch may be entitled to qualified immunity as to Count III.

We have already explained why humane society officers may not generally claim an entitlement to qualified immunity when they carry out their law enforcement activities. As we noted above, the Supreme Court has declined to decide whether qualified immunity might be available to "a private individual briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision." *Richardson,* 521 U.S. at 413, 117 S.Ct. 2100. Our Court of Appeals has not ruled on this question, but the holdings of other Courts of Appeals suggest that "defendants acting under close official supervision [are permitted] to assert qualified immunity in the face of a § 1983 suit." *Harrison v. Ash,* 539 F.3d 510, 524 n. 7 (6th Cir.2008); *see also Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc.,* 413 F.3d 1163, 1167 (10th Cir.2005) (noting that "the courts of appeals have allowed private individuals to assert qualified immunity when the defendants were closely supervised by the government"); *but see Toussie v. Powell,* 323 F.3d 178, 184 (2d

Cir.2003) ("express[ing] no opinion" on whether "a private individual ... acting under close official supervision" might enjoy qualified immunity). Following the guidance of these other Courts of Appeal and the clear implication of the Supreme Court's reservation in *Richardson,* we will extend qualified immunity to Sullivan and Mutch to the extent they "act[ed] under close official supervision."

 In *Richardson,* the Supreme Court denied qualified immunity where a private firm operated "with limited direct supervision by the government," *id.,* contrasting this firm with publicly operated jails inspected on a monthly or annual basis. *Id.* at 409, 117 S.Ct. 2100 (citing Tenn.Code Ann. §§ 41–4–116, 41–4–140(a)). *See also Ace Beverage Co. v. Lockheed Information Mgmt. Servs.,* 144 F.3d 1218, 1219–20 (9th Cir.1998) ("limited direct supervision" is present where a private organization "has the responsibility of general oversight of project activities, while the City will set policy and monitor [its] performance"). *Richardson* suggests, therefore, that "close official supervision" exists when a government actor directly inspects or directs a private individual's behavior. Applying this suggestion, it is evident that Mutch and Sullivan acted subject to precisely such supervision when they executed the search warrant on November 24, 2009 and seized property from Kauffman's farm. Before executing that warrant, Mutch obtained the approval not only of a magistrate judge but also of an assistant district attorney. These dual layers of oversight by any fair reading constituted close official supervision.

Having concluded that Mutch and Sullivan may assert a qualified immunity defense with respect to Count II of Kauffman's complaint, we now must consider whether they are entitled to that immunity. As the Supreme Court noted in *Saucier v. Katz,* 533 U.S. 194, 200–01, 121 S.Ct.

2151, 150 L.Ed.2d 272 (2001), this inquiry proceeds in two steps. First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.*, 533 U.S. at 201, 121 S.Ct. 2151. Second, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* But *Saucier*'s two-step sequence is not obligatory: "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009).

We will only consider the first prong of *Saucier* today. While Kauffman's allegations suggest that neither Mutch nor Sullivan violated his constitutional rights in executing the search warrant of his property on November 24, 2009, we cannot conclusively resolve this question until Kauffman has responded to the concerns we raised as to Count III. Kauffman argues that "there is no probable cause to arrest, cite or seize property based on the assertions in the warrant as nothing supports a violation of the animal cruelty laws and any reasonable well-trained officer would have recognized that the search was illegal." Pl.'s Compl. ¶¶ 43, 46. As we will explain, this attack on the facial validity of Mutch's warrant must fail under the first prong of *Saucier,* but Kauffman may nevertheless attack Mutch's search warrant in another manner.

As the Supreme Court explained in *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), "[a] magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" *Id.* (quoting *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)). Consequently, the standard for issuing search warrants is:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed.

*Id.* at 238–39, 103 S.Ct. 2317 (ellipsis, brackets in original) (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)).

Notwithstanding Kauffman's penchant for "purportedly" and "incredibly," he notably does not allege that Mutch's affidavit in support of her application for a search warrant contains false statements or omissions. As a result, we need only investigate whether the affidavit provided the issuing magistrate judge with a "substantial basis" for concluding that there was "a fair probability that contraband or evidence of a crime will be found in a particular place."[6] *Id.* We need not con-

---

**6.** Had Kauffman challenged the warrant by asserting that the predicate affidavit was false, we would instead have embarked on a different inquiry under which "the plaintiff must prove, by a preponderance of the evidence, (1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause." *Sherwood v. Mulvihill,* 113 F.3d 396, 399 (3d Cir.1997) (citing *Franks v. Dela-*

sider the veracity or basis of knowledge of the person who supplied Mutch with the tip concerning "sick puppies," since Mutch independently corroborated the tip's details.

■■■■ Under these circumstances, we have no difficulty finding that the search warrant issued to Mutch was facially valid. Under 18 Pa. Const. Ann. § 5511(c)(1),

A person commits an offense if he wantonly or cruelly illtreats, overloads, beats, otherwise abuses any animal, or neglects any animal as to which he has a duty of care, whether belonging to himself or otherwise, or abandons any animal, or deprives any animal of necessary sustenance, drink, shelter or veterinary care, or access to clean and sanitary shelter which will protect the animal against inclement weather and preserve the animal's body heat and keep it dry.

The description in Mutch's affidavit of "puppies living in a pen that had fecal matter and smelled of feces and urine" at Kauffman's farm, Ex. 3 to Pl.'s Compl. at 2, provided a substantial basis for a magistrate to conclude that a search of Kauffman's property would reveal evidence that Kauffman had deprived animals of "access to clean and sanitary shelter." Mutch's report that puppies purchased from Kauffman "were found to be anemic [and] have an infestation of several parasites," *id.*, provided a substantial basis to believe that a search of the Kauffman farm would uncover evidence of neglect.

Kauffman's assertion that he "had demonstrated an unconditional willingness to cooperate in resolving any potential or perceived problems and had been treating the animals through services of veterinarians," Pl.'s Compl. ¶ 43, is beside the point of the probable cause inquiry. As our Court of Appeals has explained, "the fact that there exists a less intrusive method of achieving

the government's goal is not relevant to the Court's reasonableness analysis under the Fourth Amendment." *Wilcher v. City of Wilmington*, 139 F.3d 366, 377 (3d Cir. 1998). And Kauffman does not suggest— and we have not found—any case law suggesting that providing animals with veterinary care constitutes a defense to charges of animal cruelty under Pennsylvania law. *Cf.* 18 Pa. Cons.Stat. § 5511(c)(3) (stating that the provision cited above defining cruelty to animals "shall not apply to activity undertaken in normal agricultural operation").

If Kauffman's attack on the facial validity of Mutch's search warrant fails, he still may argue that, since Mutch's "undercover search" of his property on November 23, 2009 violated the Fourth Amendment, any information resulting from that search must not be considered in examining her application for a search warrant. *See, e.g., United States v. Davis*, 383 Fed.Appx. 172, 176 (3d Cir.2010) ("The independent source doctrine next requires us to determine whether there was probable cause for the warrant to issue. The first step of this evaluation requires us to 'purge' the second warrant affidavit of any 'tainted facts and conclusions.' ").

As we have already explained, while the allegations in Kauffman's complaint do not appear to state a claim that Mutch violated the Fourth Amendment by visiting Kauffman's farm on November 23, 2009, we will permit Kauffman to brief this point. We will accordingly decline to rule on whether, after purging any "tainted" material from Mutch's affidavit, her application for a search warrant nonetheless demonstrated probable cause.

### E. *Count II: Plaintiff's Fourteenth Amendment Claim*

■■■■ Having considered Kauffman's claim that Mutch's search warrant was not

*ware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)).

based on probable cause and the defendants' response that they are entitled to qualified immunity, we are left under Count II only with Kauffman's contention that the defendants "continue to refuse to return plaintiff's property without probable case [*sic* ]." Pl.'s Compl. ¶ 44. When a plaintiff "seek[s] return of property lawfully seized but no longer needed for police investigation or criminal prosecution" from a state or local entity, his claim is properly advanced under the Due Process Clause of the Fourteenth Amendment. *See City of West Covina v. Perkins*, 525 U.S. 234, 236, 119 S.Ct. 678, 142 L.Ed.2d 636 (1999). We will therefore treat Kauffman's assertions regarding defendants' failure to return his property as a Fourteenth Amendment claim.

"In order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir.2000). Under Pa. R.Crim. P. 588(A), "[a] person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of the property on the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized." Kauffman has not alleged that he has availed himself of Rule 588, much less that the procedure the rule establishes is "unavailable or patently inadequate." [7] His Fourteenth Amendment claim therefore appears defective. Nevertheless, recognizing that the defendants did not raise this issue in their motion to dismiss, we will also give Kauffman an opportunity to explain why we should not dismiss this claim.

*ORDER*

AND NOW, this 16th day of February, 2011, upon consideration of plaintiff's May 24, 2010 complaint (docket entry # 1), defendants' August 11, 2010 partial motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) (docket entry # 5), plaintiff's August 18, 2010 exhibit to complaint (docket entry # 6), and plaintiff's August 25, 2010 response to defendant's motion to dismiss (docket entry # 7), and in accordance with the accompanying Memorandum, it is hereby ORDERED that:

1. Count I of plaintiff's complaint is DISMISSED;

2. Defendants' motion to dismiss is GRANTED as to Counts IV with respect to all defendants;

3. Defendants' motion to dismiss is GRANTED as to Counts II and III with respect to defendant The Pennsylvania Society for the Prevention of Cruelty to Animals, but is DENIED as to defendants Ashley Mutch and Kristen Sullivan; and

4. By Tuesday, March 1, 2011, the plaintiff shall file a brief, not to exceed ten pages, responding to the Court's discussion of his Fourth Amendment claim under Count III and his Fourteenth Amendment claim under Count II.

---

[7]. As Judge Ambrose has observed, "[s]everal courts have already determined that Pennsylvania has put into place adequate post-deprivation remedies." *Barber v. Pennsylvania Dep't of Agric.*, 2010 WL 1816791, at *4 (W.D.Pa.2010) (summarizing district court jurisprudence respecting Pa. R.Crim. P. 588).