RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0240p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────

UNITED PET SUPPLY, INC.,

            *Plaintiff-Appellee,*

   *v.*

CITY OF CHATTANOOGA, TENNESSEE,

            *Defendant,*

ANIMAL CARE TRUST, acting under the assumed name of McKamey Animal Care or McKamey Animal Care and Adoption Center; PAULA HURN, KAREN WALSH, and MARVIN NICHOLSON, JR., in their individual and official capacities,

            *Defendants-Appellants.*

No. 13-5181

Appeal from the United States District Court
for the Eastern District of Tennessee of Chattanooga
Nos. 1:11-cv-00157; 1:11-cv-00193—Curtis L. Collier, District Judge.

Argued:  October 8, 2013

Decided and Filed:  September 18, 2014

Before:  GUY, BATCHELDER, and MOORE, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:**  Edmund S. Sauer, BRADLEY ARANT BOULT CUMMINGS, LLP, Nashville, Tennessee, for Appellants.  M. Andrew Pippenger, LEITNER, WILLIAMS, DOOLEY & NAPOLITAN, PLLC, Chattanooga, Tennessee, for Appellee. **ON BRIEF:**  Edmund S. Sauer, BRADLEY ARANT BOULT CUMMINGS, LLP, Nashville, Tennessee, David E. Harrison, Mark W. Litchford, GRANT, KONVALINKA & HARRISON, PC, Chattanooga, Tennessee, Scott Burnett Smith, BRADLEY ARANT BOULT CUMMINGS LLP, Hunstville, Alabama, for Appellants. M. Andrew Pippenger, James S. Hildebrand, Jr., LEITNER, WILLIAMS, DOOLEY & NAPOLITAN, PLLC, Chattanooga, Tennessee, for Appellee.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.    In June 2010, Animal Care Trust ("McKamey"), a private non-profit corporation that contracted with the City of Chattanooga to provide animal-welfare services, received complaints of neglect and unsanitary conditions at a mall pet store owned by United Pet Supply, Inc. ("Pet Supply").  McKamey employees Karen Walsh and Marvin Nicholson, Jr. went to the store to investigate and discovered animals in unpleasant conditions, without water, and with no working air conditioner in the store.  Walsh and Nicholson, aided by McKamey employee Paula Hurn, proceeded to remove the animals and various business records from the store and to revoke the store's pet-dealer permit.  Pet Supply then brought the instant § 1983 suit in federal district court against the City of Chattanooga; McKamey; and McKamey employees Karen Walsh, Marvin Nicholson, Jr., and Paula Hurn in their individual and official capacities.  Pet Supply alleged that the removal of its animals and revocation of its pet-dealer permit without a prior hearing violated procedural due process and that the warrantless seizure of its animals and business records violated the Fourth Amendment.  Walsh, Nicholson, Hurn, and McKamey asserted qualified immunity as a defense to all claims.

We conclude that Hurn, acting as a private animal-welfare officer, may not assert qualified immunity as a defense against suit in her personal capacity because there is no history of immunity for animal-welfare officers and allowing her to assert qualified immunity is not consistent with the purpose of 42 U.S.C. § 1983.  However, Walsh and Nicholson, acting both as private animal-welfare officers and as specially-commissioned police officers of the City of Chattanooga, may assert qualified immunity as a defense against suit in their personal capacities.  With respect to entitlement to summary judgment on the basis of qualified immunity in the procedural due-process claims:  Walsh and Nicholson are entitled to summary judgment on the claim based on the seizure of the animals, Nicholson is entitled to summary judgment on the claim based on the seizure of the permit, and Walsh is denied summary judgment on the claim based on the seizure of the permit.  Regarding entitlement to summary judgment on the basis of qualified immunity on the Fourth Amendment claims:  Walsh and Nicholson are entitled to

summary judgment on the claim based on the seizure of the animals, Nicholson is entitled to summary judgment on the claim based on the seizure of the business records, and Walsh is denied summary judgment on the claim based on the seizure of the business records.

Because qualified immunity is not an available defense to an official-capacity suit, we conclude that Walsh, Nicholson, Hurn, and McKamey may not assert qualified immunity as a defense against suit in their official capacities.

For the reasons set forth below, we AFFIRM in part and REVERSE in part the district court's entry of summary judgment, and REMAND for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Jurisdiction

Typically, the denial of summary judgment is a non-final order that cannot be appealed under 28 U.S.C. § 1291. The interlocutory appeal of the denial of qualified immunity is permissible under the collateral-order doctrine "only 'to the extent that it turns on an issue of law.'" *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 679 (6th Cir. 2013) (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 309 (6th Cir. 2005)). "[A] defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record set forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995). "[A]n appellant's contention that the district court erred in finding a genuine issue of fact for trial is not the type of legal question which we may entertain on an interlocutory basis." *Gregory v. City of Louisville*, 444 F.3d 725, 743 (6th Cir. 2006). Improper arguments contesting whether a genuine issue of fact exists do not deprive this court of jurisdiction; "even where, as here, the defendant makes 'impermissible arguments regarding disputes of fact,' if the defendant also raises the purely legal issue of whether the plaintiff's facts show that the defendant violated clearly established law, 'then there is an issue over which this court has jurisdiction.'" *Quigley*, 707 F.3d at 680 (quoting *Estate of Carter*, 408 F.3d at 310)).

The defendants in this case are a private non-profit corporation that contracts with the City of Chattanooga and the corporation's employees.  As with government officials, we permit "private parties to obtain interlocutory review of denials of qualified immunity."  *Brotherton v. Cleveland*, 173 F.3d 552, 559 (6th Cir. 1999).  Accordingly, we have jurisdiction over this appeal of the denial of qualified immunity.

## B.  Factual Background

The plaintiff-appellee in this suit is United Pet Supply, Inc., ("Pet Supply"), a private corporation that owns multiple pet stores, including the Hamilton Place Mall pet store at the center of this dispute ("the pet store").  The defendants-appellants are Animal Care Trust ("McKamey"), a private non-profit corporation that contracts with the City of Chattanooga to provide animal-welfare services, and McKamey employees Paula Hurn, Karen Walsh, and Marvin Nicholson, Jr.  Defendant Walsh is the executive director of McKamey.  R. 70-7 (Walsh Aff. at ¶ 2) (Page ID #1603).  Defendant Nicholson is an animal-services officer at McKamey.  R. 70-8 (Nicholson Aff. at ¶ 2) (Page ID #1635).  Defendant Hurn is the Director of Operations at McKamey.  R. 67-1 (Hurn Aff. at ¶ 2) (Page ID #1205).  The contract between McKamey and the City of Chattanooga permitted McKamey employees to be commissioned as special police officers of the city authorized to investigate animal neglect and cruelty complaints and to issue citations.  R. 70-2 (Contract at 2–3) (Page ID #1411–112).  Both Walsh and Nicholson were commissioned as special police officers for the City of Chattanooga at the time of the events in this lawsuit.  R. 70-7 (Walsh Aff. at ¶ 4) (Page ID #1604); R. 70-8 (Nicholson Aff. at ¶ 4) (Page ID #1636).  Hurn was not commissioned as a special police officer.

In the months preceding the incident that gave rise to this suit, McKamey received complaints about "animal neglect occurring and unsanitary conditions existing" at the pet store.  R. 70-7 (Walsh Aff. at ¶ 7) (Page ID #1604).  According to Steven Zerilli, the President of Pet Supply, Walsh and Nicholson visited Pet Supply on seven occasions between January and April 2010 and issued only one warning; the warning involved availability of treatment records for a canary.  R. 96-4 (Zerilli Aff. at ¶ 12) (Page ID #3270).  On May 11, 2010, McKamey issued Pet Supply a permit certifying that the store "has met the requirements of the Code of the City of

Chattanooga and is approved by the McKamey Animal Services Division to operate as a Pet Dealer in the City of Chattanooga." R. 69-3 (Pet Dealer Permit at 1) (Page ID #1340).

In June 2010, Pet Supply employee Ashley Knight came to McKamey and requested a meeting with Walsh. Walsh reported that Knight described "incidents of animal neglect and abuse" at the store, "including a dead puppy listed 'Fit for Sale' was stuffed in a refrigerator freezer with the employees' lunches, a broken air conditioner, and a live hamster that [Pet Supply manager Brandy] Hallman placed in a garbage compactor." R. 70-7 (Walsh Aff. at ¶ 10) (Page ID #1605). Based on this report, Walsh contacted the Tennessee Department of Agriculture, which enforces state animal law, and asked whether the Department would assist in an investigation of the pet store. *Id.* at ¶ 11 (Page ID #1605–06). State Animal Health Technician Joe Burns agreed to assist McKamey with the investigation. *Id.*

Without notifying Pet Supply in advance, Walsh, Burns, and Nicholson arrived at the pet store on June 15, 2010, around 8:00 a.m. *Id.* at ¶ 15 (Page ID #1606). Hallman permitted the three individuals to enter the store. *Id.* at ¶ 17–18 (Page ID #1607). Hallman confirmed Knight's report that a puppy had recently died at the store and that the puppy's carcass had been placed in the refrigerator freezer. R. 70-8 (Nicholson Aff. at ¶ 18) (Page ID #1639). Walsh and Nicholson observed "little to no evidence of food or water for the puppies"; "unsanitary conditions such as dried fecal matter that was matted in the fur of the puppies"; "damaged and cracked cages"; "puppies that appeared to be very lethargic and dehydrated," some of whom were struggling to drink water; and "that the store's interior temperature was considerably hotter than the Mall's open corridor section." R. 70-7 (Walsh Aff. at ¶ 16, 19) (Page ID #1606, 1607); *see also* R. 70-8 (Nicholson Aff. at ¶ 16, 19) (Page ID #1638, 1639). Walsh asked Hallman about the air conditioner and was told that it had been broken for several weeks; Hallman had reported the problem to corporate headquarters, but she was unaware of when, or if, the air conditioner would be repaired. R. 70-7 (Walsh Aff. at ¶ 20) (Page ID #1607). While cleaning out the hamster cages, Hurn "discovered that there was a dead hamster in one of the plastic hamster houses. The hamster was stiff and the hair had fallen off its body." R. 67-1 (Hurn Aff. at ¶ 14) (Page ID #1208). Hurn averred that the Pet Supply staff "did not have any knowledge about the dead hamster." *Id.* Walsh observed a hamster with a large bite wound; Hallman

reported that the animal had not been seen by a veterinarian.  R. 87-12 (Walsh Dep. at 155) (Page ID #2815).  Walsh testified that there was only one person cleaning when they arrived at the store and that she was told that the next employee did not arrive until 10:00 a.m.  R. 70-5 (Walsh Dep. at 327) (Page ID #1566).  Walsh did not see anyone providing water to the puppies when she arrived, and there was no evidence that food had been provided that morning.  R. 87-12 (Walsh Dep. at 192) (Page ID #2818).  Walsh asked a Pet Supply employee when they usually fed the animals and was told that they usually feed the animals when they arrive, but the employees had arrived at 7:00 a.m. and there was no food for the animals when the McKamey employees arrived approximately one hour later.  *Id*. at 193 (Page ID #2819).

Walsh and Nicholson concluded "that the animals were suffering from the conditions in the Pet [Supply] Store and that these conditions had persisted for a period of time."  R. 70-7 (Walsh Aff. at ¶ 21) (Page ID #1607); R. 70-8 (Nicholson Aff. at ¶ 21) (Page ID #1639).  Walsh "determined that the animals were suffering from neglect and inadequate care in violation of the Chattanooga City Code and that the animals were subject to impound by McKamey."  R. 70-7 (Walsh Aff. at ¶ 25) (Page ID #1609).  In her deposition, Walsh testified that she believed that under the city code, "[i]f animals are in a situation where it's our understanding that they are in a neglectful situation or they're in a situation where they're in imminent danger, we are permitted to remove them."  R. 70-5 (Walsh Dep. at 314) (Page ID #1553).  Walsh later explained that her main concerns that led to the decision to remove the dogs were:

> [T]hat the conditions in the store were very hot, that the animals were very listless, that they were not as responsive as puppies would normally be, that the store itself, there were many poorly maintained cages where body fluids were going down from one puppy to another.  In the isolation room, the puppy in there had some pretty severe diarrhea, and it was extremely hot in there, for even a healthy animal, let alone being a debilitated one.  There were some animals that were panting.  There were some that were just, like their eyes were sunken, which is a symptom of dehydration.  I felt like they weren't receiving adequate hydration from the bottles that they were given.

R. 87-12 (Walsh Dep. at 156–57) (Page ID #2816).

Walsh spoke with Christopher Brooks, Pet Supply vice president, and explained that she was going to remove the animals from the store.  R. 70-7 (Walsh Aff. at ¶ 29) (Page ID #1609). Pet Supply proceeded to file an emergency petition for injunctive relief in Hamilton County

Circuit Court to prevent the removal of the animals and related records.  R. 87-17 (Pet. for Inj.) (Page ID #2972–74).  At 1:30 p.m., in the midst of the removal of the animals from the store, a hearing was held on the petition.  Walsh testified about her observations of the store and her belief that the animals' health and safety was at risk.  R. 70-7 (Walsh Aff. at ¶ 32) (Page ID #1610).  Walsh reported that the judge stated that "he believed the City Code authorized McKamey to remove the animals from the store and that the testimony demonstrated McKamey had good cause to remove the animals," and denied the request for a temporary restraining order. *Id*.

Walsh, Nicholson, and Burns returned to the store and continued removing the animals.  The animals were placed in a McKamey truck with air conditioning and water, and were inspected by veterinarians.  Two puppies needed immediate medical attention.  R. 70-7 (Walsh Aff. at ¶ 35) (Page ID #1611).  McKamey employees obtained the impound information and medical records for the animals from Pet Supply employees.  R. 67-1 (Hurn Aff. at ¶ 13) (Page ID #1207–08).  In total, the officers seized thirty-two puppies and fifty-five exotic pets.  R. 70-7 (Walsh Aff. at ¶ 34) (Page ID #1611).  The McKamey employees did not remove the reptiles "[b]ecause reptiles don't react badly to the heat that was present in the store."  R. 87-12 (Walsh Dep. at 156) (Page ID #2816).  Walsh gave Pet Supply employees a Summons Ordinance that cited ninety violations of the City Code.  There was a handwritten notation on the document: "§ 7-34(e) revoked permit."[1]  R. 69-7 (Citation at 1) (Page ID #1346).  Walsh also gave a note to Hallman stating that their case will be in city court on June 24, 2010, and "[d]uring this time you are not able to sell pets.  This does not mean that you are unable to sell retail items during the period between now and court."  R. 69-6 (Walsh Note at 1) (Page ID #1345).

Officer Burns cited Pet Supply for violations of state animal-welfare law.  R. 87-10, Ex. 1 (Citation & Report at 1–4) (Page ID #2770–73).  In his Field Activity Report, Burns noted "[a]ir conditioner not working," "[w]ater bowls dirty or empty," "[i]solation for sick puppies 80+ degree's [sic] at 7am C.S.T," "hamsters + gerbils water container dirty," "cages cleaned with

---

[1]The State of Tennessee ultimately declined to pursue suspension of the license contingent on the store correcting problems with broken cages, remedying inadequate cleaning practices, improving employee training, verifying health of sick animals before they are sold, improving ventilation, and ensuring adequate provision of clean water to animals.  R. 87-10, Ex. 6 (Tenn. Dep't of Ag. Letter at 1–3) (Page ID #2782–84).

bleach – not disinfectant." R. 87-10, Ex. 2 (Field Activity Report at 1) (Page ID #2770). Walsh and Burns conferred; Burns averred that "it was my opinion that Officer Walsh made the reasonable and necessary decision regarding the removal of the animals." R. 87-10 (Burns Aff. at ¶ 14) (Page ID #2764). The state veterinarian notified Pet Supply of his intent to suspend the store's state pet-dealer license. R. 87-10, Ex. 4 (Notice to Suspend) (Page ID #2776–89).

On June 18, 2010, Walsh sent fecal samples from four puppies to a laboratory for testing; all four tested positive for Coccidia and Giardia. R. 70-7 (Walsh Aff. at ¶ 39) (Page ID #1612). On July 3, 2010, the laboratory confirmed that eighteen puppies tested positive for Giardia and/or Coccidia. *Id.* at ¶ 40 (Page ID #1813).

## C.  City Court Proceedings

Nine days after the seizure, on June 24, 2010, the parties appeared in Chattanooga City Court for a hearing. The court heard three days of testimony from multiple witnesses. R. 70-11 (6/24/2010 Hr'g Tr. 492) (Page ID #1667–68). The judge noted that "the heat in the store, accompanied with the sick animals in isolation, along with the smell necessitated their removal." *Id.* at 496 (Page ID #1671). The judge concluded that the violations of the city code could be remedied and that the store had already fixed the air conditioner, and so decided "to pass this case for two weeks for the issues presented to be remedied and reinspected before any animals may be brought back for sale," and to allow the state department of agriculture decide whether it would take any action. *Id.* at 502 (Page ID #1677). The judge ordered that the healthy animals be returned to Pet Supply to place them in another store that had no violations, but that animals could not return to the Hamilton Place Mall pet store until the store was inspected and approved by McKamey and the state department of agriculture, should it choose to participate. *Id.* at 502–03 (Page ID #1676–77). The judge ordered that none of the sick animals would be returned until treated and cleared by a veterinarian. *Id.* at 503 (Page ID #1678). On July 14, 2010, the city court resumed proceedings. The judge concluded that Pet Supply had addressed "[t]he major issues" in the store. R. 69-8 (7/14/2010 Hr'g Tr. at 88) (Page ID #1348). She also ruled that she was "not going to revoke the permit or prohibit [Pet Supply] from operating their store at this point unless subject to the State, unless the state department of agriculture suspends or revokes

the license for some reason . . . . That's my ruling today." *Id*. She reserved the issue of expenses, fines, and court costs until the next hearing. *Id*.

At the hearing on July 21, 2010, counsel for McKamey argued that Pet Supply needed to re-apply for their permit and could be issued a permit at the order of the court. R. 69-9 (7/21/2010 Hr'g Tr. at 113–14) (Page ID #1350–51). Counsel for Pet Supply argued that "[t]he Court ruled that we may get our license back, that it was not revoking our license. We should have the license returned to us, the same one that they took from our store." *Id*. at 114 (Page ID #1351). Counsel for McKamey responded that licensure was "an administrative decision" and that Pet Supply had to re-apply. *Id*. The judge expressed confusion over whether the City of Chattanooga, McKamey, or the court had the power to decide whether the permit was revoked. *Id*. at 1352. The judge concluded that the citations for abuse and neglect were independent of the revocation of the permit: "I could still impose a fine and court costs on these violations for neglect, but they could be corrected or have been corrected, which would not result in the revocation of their dealer permit." *Id*. at 116–17 (Page ID #1353–54). The judge concluded that she was "not going to withhold the permit subject to whatever the Tennessee Department of Agriculture does" and that she was "not going to require reapplication for something that has never been actually determined to be revoked, if that makes sense." *Id*. at 117–18 (Page ID #1354–55).

On July 26, 2010, due to the receipt of an ex parte email communication from the Chattanooga Mayor Ron Littlefield advocating for a particular outcome in the dispute, the judge declared a mistrial and recused herself. R. 69-10 (Mistrial Order at 1) (Page ID #1356). The case was assigned to a different judge, who granted Pet Supply's motion to dismiss on the basis of double jeopardy. R. 69-12 (City Court Order at 3–4) (Page ID #1370–71). The judge stated that "[t]he court is [ ] of the opinion the City Court has no authority to revoke or make any order relative to the license of the Pet Company." *Id*. at 3 n.1 (Page ID #1370). The judge ordered that the dogs should be delivered to a veterinarian, and once the veterinarian deemed the dogs medically fit they could be transferred to Pet Supply; the judge also ruled "that the dogs are not to be returned to [Pet Supply's] store at Hamilton Place Mall." R. 70-16 (Dogs Order at 1–2) (Page ID #1713–14). The dogs were delivered to the veterinarian on or around October 3, 2010.

R. 70-7 (Walsh Aff. at ¶ 46) (Page ID #1613). "McKamey incurred approximately $50,000 in expenses to provide shelter and veterinary care for the animals." *Id*. at ¶ 47 (Page ID #1614).

**D. Federal District Court Proceedings**

Pet Supply filed this 42 U.S.C. § 1983 suit in the United States District Court for the Eastern District of Tennessee against the City of Chattanooga; McKamey; and Walsh, Nicholson, and Hurn in their individual and official capacities. R. 1 (Compl. at ¶ 17, 22) (Page ID #4, 5). Pet Supply alleged that its procedural due-process rights were violated by the seizure of the animals, business records, and permit without prior notice and hearing, and that its Fourth Amendment rights were violated by the warrantless search of the store and seizure of the animals and records. McKamey moved for judgment on the pleadings, asserting that the "Moving Defendants" (McKamey, Walsh, Nicholson, and Hurn) are entitled to qualified immunity. R. 38 (McKamey Memo. J. Pleadings at 1, 16) (Page ID #375, 390).

Before the district court ruled on the motion for judgment on the pleadings, Walsh, Hurn, and Nicholson moved for summary judgment in their individual capacities, asserting that they were immune from suit on the basis of qualified immunity, amongst other arguments. R. 73 (Walsh Mot. Summ. J. at 21) (Page ID #2052); R. 65 (Nicholson Mot. Summ. J. at 10) (Page ID #982); R. 68 (Hurn Memo. Summ. J. at 9) (Page ID #1320). McKamey also moved for summary judgment, asserting that it was immune from suit on the basis of qualified immunity. R. 71 (McKamey Memo. Summ. J. at 34) (Page ID #1797). Pet Supply moved for partial summary judgment on the Fourth Amendment search-and-seizure claim. R. 82 (Mot. Partial Summ. J. at 1–2) (Page ID #2446–47).

The district court granted in part and denied in part McKamey's motion for judgment on the pleadings. In a discussion of qualified immunity, the district court rejected the plaintiffs' argument that qualified immunity was not applicable to Walsh because she was a private actor and concluded that "immunity is available to Defendant Walsh." *United Pet Supply, Inc. v. City of Chattanooga ("Pet Supply I")*, 921 F. Supp. 2d 835, 857–58 (E.D. Tenn. 2013). The district court did not rule on whether qualified immunity was available to Nicholson and Hurn in their individual capacities. The district court held that Pet Supply pleaded a violation of clearly established rights, therefore precluding a grant of qualified immunity to the defendants. *Pet*

*Supply I*, 921 F. Supp. 2d at 860. Next, the district court considered the official-capacity suits; noting that "a suit for damages against an officer in his official capacity . . . is construed as a suit against [the] entity for which he works," the district court construed the official-capacity suits against Walsh, Nicholson, and Hurn "as claims against Defendant McKamey, who Plaintiff also listed separately as a defendant." *Id.* at 860. The district court concluded that liability may be imputed to McKamey, and then determined that "[f]or the reasons the Court concluded qualified immunity was inappropriate for the individual defendants, it also concludes qualified immunity is inappropriate for McKamey." *Id.*

One day later, the district court ruled on the cross-motions for summary judgment. On the procedural due-process claim based on the revocation of the permit, the district court found that "no relevant factual dispute exists as to the revocation of Plaintiff's permit," granted Pet Supply's motion for summary judgment on that claim, and denied defendant's motion for summary judgment on the claim. *United Pet Supply, Inc. v. City of Chattanooga ("Pet Supply II")*, Nos. 1:11-CV-157, 1:-11-CV-193, 2013 WL 449760, at *6 (E.D. Tenn. Feb. 6, 2013). On the Fourth Amendment warrantless-search claim, the district court found that consent was voluntarily given to the McKamey employees to enter the store, and the district court granted summary judgment to defendants. *Id.* at *7–8. On the procedural due-process claim based on the seizure of the animals without a prior hearing and the Fourth Amendment claims of warrantless seizure of animals and business records, the district court concluded that significant factual disputes existed, and declined to grant summary judgment to either party. *Id.* at *6–7, *8–10. The district court denied qualified immunity to defendants in their individual capacities, concluding that "[f]or the reasons stated in its previous order, the Court concludes the rights allegedly violated were clearly established to a reasonable individual." *Id.* at *10. The district court also "conclude[d] a question of fact remains regarding liability of the City," *id.* at *11, denied the City of Chattanooga's motion for summary judgment, and denied McKamey's "motion for summary judgment on the same issue." *Id.* at *13.

Defendants McKamey, Walsh, Nicholson, and Hurn appeal the denial of their joint motion for judgment on the pleadings and the four separate motions for summary judgment.

## II. ANALYSIS

"Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law.  Anyone whose conduct is 'fairly attributable to the state can be sued as a state actor under § 1983." *Filarsky v. Delia*, 132 S. Ct. 1657, 1661 (2012) (internal citation omitted).  "It is well settled that private parties that perform fundamentally public functions, or who jointly participate with a state to engage in concerted activity, are regarded as acting 'under the color of state law' for the purposes of § 1983." *Bartell v. Lohiser*, 215 F.3d 550, 556 (6th Cir. 2000).  McKamey is a private non-profit corporation and Walsh, Nicholson, and Hurn are employees of that corporation; Walsh and Nicholson were also commissioned as special police officers of the City of Chattanooga.  "The parties agree Defendants acted under color of state law." *Pet Supply II*, 2013 WL 449760, at \*6.

The defendants appeal the district court's denial of qualified immunity.  "Qualified immunity strikes a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions." *Wyatt v. Cole*, 504 U.S. 158, 167 (1992).  In response to an assertion of qualified immunity, "the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity." *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007).  "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014).  We review de novo "the district court's denial of a defendant's motion for summary judgment on the basis of qualified immunity." *Summers v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004).

We first consider whether Walsh, Nicholson, and Hurn may assert qualified immunity in their individual capacities, and whether Walsh, Nicholson, Hurn, and McKamey may assert qualified immunity in their official capacities.  We will then consider whether any defendants who may assert qualified immunity are entitled to summary judgment on that basis.

**A. May Defendants Assert Qualified Immunity?**

    **1. Walsh, Nicholson, and Hurn in their individual capacities**

In the individual-capacity suits, we conclude that Walsh and Nicholson may assert qualified immunity, but that Hurn may not.

Walsh and Nicholson were commissioned as special police officers of the City of Chattanooga at the time of the Pet Supply incident. R. 70-7 (Walsh Aff. at ¶ 4) (Page ID #1604); R. 70-8 (Nicholson Aff. at ¶ 4) (Page ID #1636). It is well established that police officers may assert qualified immunity. *See Malley v. Briggs*, 475 U.S. 335, 340–41 (1986); *Pierson v. Ray*, 386 U.S. 547, 556–57 (1967). Because Walsh and Nicholson were acting in their capacity as public police officers, they may assert qualified immunity in the suit against them in their individual capacities. Whether they are entitled to qualified immunity will be discussed *infra*.

Hurn's claim of qualified immunity presents a more complicated question. Hurn was not commissioned as a special police officer; she was working only in the capacity of her position as a McKamey employee, that is, an employee of a private contractor. Determining whether an employee of a private contractor that is acting under color of state law may herself assert qualified immunity demands a fact-intensive analysis under which some employees may be permitted to assert qualified immunity and some may not. *See Richardson v. McKnight*, 521 U.S. 399, 404–12 (1997) (guards employed by a private prison corporation may not assert qualified immunity); *McCullum v. Tepe*, 693 F.3d 696, 702–04 (6th Cir. 2012) (a prison psychiatrist employed by a non-profit entity may not assert qualified immunity); *Harrison v. Ash*, 539 F.3d 510, 521–25 (6th Cir. 2008) (prison nurses employed by a private medical provider may not assert qualified immunity); *Cooper v. Parrish*, 203 F.3d 937, 952–53 (6th Cir. 2000) (private attorney working alongside a prosecutor may not assert qualified immunity). *But see Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 442 F.3d 410, 438–40 (6th Cir. 2006), *rev'd on other grounds*, 551 U.S. 291 (2007), (executive director of a private high school athletics association may assert qualified immunity); *Cullinan v. Abramson*, 128 F. 3d 301, 310–11 (6th Cir. 1997) (private attorneys serving as outside counsel to a city may assert qualified immunity); *Bartell*, 215 F.3d at 556–57 (employees of a private foster-care agency may assert qualified immunity).

To determine whether a private party may assert qualified immunity, we consider:

> [I]f a party seeking immunity would have been shielded from tort liability when Congress enacted the Civil Rights Act of 1871—§ 1 of which is codified at 42 U.S.C. § 1983—we infer from legislative silence that Congress did not intend to abrogate such immunities when it imposed liability for actions taken under color of state law.  But even with such an inference, and irrespective of the common law support, we will not recognize an immunity available at common law if § 1983's history or purpose counsel against applying it in § 1983 actions. Thus, when a private party . . . seeks qualified immunity from a § 1983 suit, we determine whether:  (1) there was a firmly rooted history of immunity for similarly situated parties at common law; and (2) whether granting immunity would be consistent with the history and purpose of § 1983.

*McCullum*, 693 F.3d at 700 (internal quotation marks and citations omitted).  After considering whether there was a common-law tradition of immunity for similarly situated defendants and whether granting immunity would further the purposes of § 1983, the district court concluded that the individual defendants may assert qualified immunity.  We disagree with respect to Hurn.

First, we look to history.  There is no history of immunity for animal-welfare organizations or their employees in 1871 when Congress enacted § 1983.  Indeed, we do not find, and the parties do not identify, any cases involving animal-welfare organizations whatsoever prior to 1871.  "This is not surprising in view of the reality that the [defendant Pennsylvania Society for the Prevention of Cruelty to Animals] only came into being in 1868 and that it is not unlikely that other such societies were not established until after 1871." *Kauffman v. Pa. Soc'y for the Prevention of Cruelty to Animals*, 766 F. Supp. 2d 555, 564–65 (E.D. Pa. 2011) (footnote omitted).  Thus, there is no tradition of immunity for animal-welfare officers, nor is there a clear tradition of denying immunity to employees of animal-welfare organizations.  We have previously held that the absence of a "'firmly rooted' history" of immunity does not preclude eligibility for qualified immunity when the particular organization has "only recently grown in importance and stature, and litigation involving such associations has been relatively rare." *Brentwood Acad.*, 442 F.3d at 439 (concluding that the executive director of a private high school athletics association was entitled to qualified immunity).

Accordingly, the absence of a history of qualified immunity for similarly situated defendants, under *Brentwood*, does not necessarily preclude Hurn from asserting qualified immunity.[2]

Next, we consider whether granting qualified immunity to Hurn is consistent with the purpose of § 1983. "[O]ur analysis hinges on three of § 1983's goals: (1) protecting the public from unwarranted timidity on the part of public officials; (2) ensur[ing] that talented candidates were not deterred by the threat of damages suits from entering public service; and (3) guarding against the distraction from job duties that lawsuits inevitably create." *McCullum*, 693 F.3d at 704 (internal quotation marks and citations omitted).

Preventing unwarranted timidity is "'the most important special government immunity-producing concern.'" *Filarsky*, 132 S. Ct. at 1665 (quoting *Richardson*, 521 U.S. at 409)). In *Richardson*, the Supreme Court concluded that the concern about unwarranted timidity was alleviated by the existence of market pressures on a private prison corporation. The corporation ran the prison with little state supervision, was required by the state contract to buy insurance to compensate victims of civil-rights violations, and the contract expired in three years, thus creating market pressure to perform or be replaced. *Richardson*, 521 U.S. at 409–11. Additionally, unlike the government, the private firm could incentivize the desired bold action by "permit[ting] employee indemnification and avoid[ing] many civil-service restrictions." *Id.* at 410. Because of these features, the private prison corporation more closely resembled a private firm than the government:

> [T]he employees before us resemble those of other private firms and differ from government employees. . . . [G]overnment employees typically act within a *different* system. They work within a system that is responsible through elected officials to voters who, when they vote, rarely consider the performance of individual subdepartments or civil servants specifically and in detail. And that system is often characterized by multidepartment civil service rules that, while providing employee security, may limit the incentives or the ability of individual departments or supervisors flexibly to reward, or to punish, individual employees. Hence a judicial determination that "effectiveness" concerns warrant special

---

[2]We recently noted, however, that it was unclear "'whether policy and history form a conjunctive or disjunctive test,'" and we questioned whether a court may "extend qualified immunity where there was no history of immunity at common law, even if sound policy justified the extension." *McCullum*, 693 F.3d at 700 n.7 (quoting *Developments in the Law—State Action and the Public/Private Distinction, III. Private Party Immunity from Section 1983 Suits*, 123 Harv. L. Rev. 1266, 1271 (2010)).

immunity-type protection in respect to this latter (governmental) system does not prove its need in respect to the former. Consequently, we can find no *special* immunity-related need to encourage vigorous performance.

*Id.* at 410–11.

"*Richardson* was a self-conciously 'narrow[ ]' decision" and the particular circumstances of that prison corporation are often not "involved . . . in the typical case of an individual hired by the government to assist in carrying out its work." *Filarsky*, 132 S. Ct. at 1667 (quoting *Richardson*, 521 U.S. at 413). However, many of the characteristics present in *Richardson* are present here. Like the prison corporation for which the defendant prison guards in *Richardson* worked, McKamey is "systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government." *Richardson*, 521 U.S. at 413. McKamey is wholly responsible for animal-welfare services for the City of Chattanooga. Under the contract, McKamey is obligated to run a facility; care for all of the animals that are placed into McKamey's custody; attempt to re-connect owners with impounded animals; sell and process applications for animal licenses; observe, test, and/or euthanize rabies-suspect animals; and create and run a spay/neuter program. R. 70-2 (Contract at 3–10) (Page ID #1412–18). The City does not in any way supervise McKamey employees. Although McKamey worked with state officer Burns on the particular investigation at issue in this case, that relationship was a collaboration of equals, not a hierarchy with Burns leading or supervising the McKamey employees. *See* R. 70-7 (Walsh Aff. at ¶ 11, 24) (Page ID #1605, 1608). This situation is quite different from the employees of a private foster-care agency permitted to assert qualified immunity in *Bartell*, 215 F.3d at 556–57, where the state agency closely supervised the private agency, including appointing a caseworker to monitor foster-care plans and specifically approving the plan for the child at issue in the case.

Where the replacement of a private contractor "may be burdensome" but "not so burdensome that [the entity] do[es] not face the threat of replacement," the threat of replacement adds to the market pressure. *Rosewood Servs., Inc., v. Sunflower Diversified Servs., Inc.*, 413 F.3d 1163, 1169 (10th Cir. 2005). McKamey's contract with the City of Chattanooga is even shorter than the prison corporation's contract with the State of Tennessee in *Richardson*. The initial contract term was one year, and the City may renew the contract for subsequent one-

year periods, but the City may decline to renew the contract for any reason or no reason at all. R. 70-2 (Contract at 10–11) (Page ID #1418–19). A for-profit corporation or non-profit organization that provides a truly unique service and has no competitors may exist outside of normal market pressures. *See Brentwood Acad.*, 442 F.3d at 439 (permitting the executive director of a private high school athletics association to assert qualified immunity, and noting that the association, "does not have to compete with other firms for the job it does on behalf of the state."). However, there is no evidence in the record that McKamey has no competitors in the city or state that could feasibly replace the organization should the city decline to renew McKamey's contract. Thus, the record does not demonstrate any barriers to the City's declining to renew McKamey's contract.

Unlike the prison corporation in *Richardson*, McKamey does not "undertake[] [its] task for profit" but that does not mean that it is not "potentially in competition with other firms." *Richardson*, 521 U.S. at 413. Non-profit organizations can be, and often are, part of a competitive marketplace seeking limited grant funding, government contracts, and volunteer support. "[B]oth profit and nonprofit firms compete for municipal contracts, and both have incentives to display effective performance." *Halvorsen v. Baird*, 146 F.3d 680, 686 (9th Cir. 1998); *see also Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 82 F. Supp. 2d 901, 906 (N.D. Ill. 2000) (quoting Troyen A. Brennan, *Symposium: Implementing U.S. Health Care Reform*, 19 Am. J.L. & Med. 37, 74 (1993) ("[T]he behavior of not-for-profit hospitals is similar to that of for-profits: 'while the former does not legally earn a profit for shareholders, it does attempt to maximize fund balances and other measures of economic health.'")). Additionally, in its capacity as an animal shelter seeking homes for animals and money spent on animals, McKamey competes with the private pet-store market. Appellee Br. at 58–59.

The ease by which the City can discontinue its contract with McKamey and the absence of evidence that McKamey is irreplaceable together demonstrate that McKamey is subject to the sort of market pressures that obviate unwarranted timidity in the absence of qualified immunity.

Next, we consider whether prohibiting Hurn from asserting qualified immunity would discourage talented candidates from entering public service. In *Filarsky*, the Supreme Court

explained the importance of qualified immunity to ensuring that the government can attract the best and the brightest:

> [I]t is often when there is a particular need for specialized knowledge or expertise that the government must look outside its permanent work force to secure the services of private individuals. . . . To the extent such private individuals do not depend on the government for their livelihood, they have freedom to select other work—work that will not expose them to liability for government actions. This makes it more likely that the most talented candidates will decline public engagements if they do not receive the same immunity enjoyed by their public employee counterparts.

132 S. Ct. at 1665–66. However, "a private firm's ability to 'offset any increased employee liability risk with higher pay or extra benefits'" can mitigate the concern that individuals will refuse to work on behalf of the government without qualified immunity protection. *McCullum*, 693 F.3d at 704 (citation omitted). Pet Supply points to language in the contract requiring McKamey to purchase general liability insurance and to indemnify the city, R. 70-2 (Contract at 20–21) (Page ID #1428–29), but there is no evidence that McKamey indemnifies its employees or provides higher pay or benefits to mitigate the risk of liability. Qualified individuals may be discouraged from contracting with the city if they are at risk of liability and do not have the protection of qualified immunity. Accordingly, this factor leans in favor of permitting McKamey and its employees to assert qualified immunity.

Finally, we consider whether denying qualified immunity would lead to distraction from job duties. "[L]awsuits may well distract these employees from their . . . duties, but the risk of distraction alone cannot be sufficient grounds for an immunity. Our qualified immunity cases do not contemplate the complete elimination of lawsuit-based distractions." *Richardson*, 521 U.S. at 411 (internal quotation marks and citation omitted). However, the Supreme Court has expressed concern that the distraction of a lawsuit may extend beyond the private contractors to full-time government employees with whom the contractors work. *Filarsky*, 132 S. Ct. at 1666. For example, if this suit continues, state officer Burns may be required to testify. Without qualified immunity there is a risk that various McKamey employees and a single state employee may be distracted from their animal-welfare duties, so this factor counsels in favor of permitting the assertion of qualified immunity, but does not weigh heavily in the overall calculation.

In sum: there is no history of immunity for similarly situated defendants, but similar organizations did not exist in 1871 and there is no history of denying immunity; McKamey faces market pressures; refusing to allow qualified immunity could discourage qualified animal-welfare advocates from working on behalf of the City of Chattanooga; and having to go through a lawsuit could distract the defendants-appellants and possibly a single state employee from their job duties. This is a very close case but because there is no history of immunity and the most important immunity-producing concern—preventing unwarranted timidity—counsels against permitting the assertion of qualified immunity, we conclude that Hurn may not assert qualified immunity as a defense to suit in her personal capacity.

### 2. Walsh, Nicholson, Hurn, and McKamey in their official capacities

"A suit against an individual in his [or her] official capacity is the equivalent of a suit against the governmental entity." *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). "In an official capacity action, the plaintiff seeks damages not from the individual officer, but from the entity for which the officer is an agent." *Pusey v. City of Youngstown*, 11 F.3d 652, 657 (6th Cir. 1993). Thus, in *Pet Supply I*, the district court properly construed Pet Supply's claim against Walsh, Nicholson, and Hurn in their official capacity as a claim against McKamey. *Pet Supply I*, 921 F. Supp. 2d at 860. The district court concluded that "although it is an entity, McKamey can also assert the defense of qualified immunity," but denied qualified immunity to McKamey because the plaintiffs had pleaded a violation of a clearly established constitutional right. *Id.* at 860. In *Pet Supply II*, the district court denied McKamey's motion for summary judgment asserting qualified immunity. *Pet Supply II*, 2013 WL 449760, at *13.

The district court's suggestion that McKamey could assert qualified immunity as a defense to an official-capacity suit was in error. The Supreme Court very clearly held in *Kentucky v. Graham* that qualified immunity was not an available defense in an official-capacity suit:

> On the merits, to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. More is required in an official-capacity action, however, for a governmental entity is liable under §1983 only when the entity itself is a moving force behind the deprivation; thus, in an official-capacity suit

the entity's policy or custom must have played a part in the violation of federal law.  When it comes to defenses to liability, an official in a personal-capacity action may, depending on his position, be able to assert personal immunity defenses, such as [absolute immunity or qualified immunity].  In an official-capacity action, these defenses are unavailable.  The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment.

473 U.S. 159, 166–67 (1985) (internal quotation marks, citations, and footnotes omitted).

We have always understood qualified immunity to be a defense available only to individual government officials sued in their personal capacity.  "As qualified immunity protects a public official in his individual capacity from civil damages, such immunity is unavailable to the public entity itself." *Everson v. Leis*, 556 F.3d 484, 501 n.7 (6th Cir. 2009); *see also Hidden Vill., LLC v. City of Lakewood*, 734 F.3d 519, 523 (6th Cir. 2013) ("Lakewood is not eligible for qualified immunity because it is a city, not an individual.").  That McKamey is a private entity acting in a governmental capacity does not change the unavailability of qualified immunity as a defense in an official-capacity suit.  Just as the City of Chattanooga cannot assert qualified immunity as a defense against an official-capacity suit, neither can Walsh, Nicholson, Hurn, or McKamey.[3]

**B.  Did Walsh and Nicholson violate a clearly established constitutional right?**

Having concluded that Walsh and Nicholson may assert qualified immunity in their individual capacities, we now consider whether Walsh and Nicholson are entitled to qualified immunity in this § 1983 suit.  An assertion of qualified immunity may be overcome if the defendants violated a clearly established constitutional right.  We consider whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's

---

[3]We note that in *Bartell* we permitted a non-profit entity to assert qualified immunity in a case where it was not specified whether the defendants were sued in their official or individual capacity.  *Bartell*, 215 F.3d at 557.  Because we previously permitted a corporate defendant to assert qualified immunity as a defense to an individual-capacity suit, *Cullinan*, 128 F.3d at 310–11, and because permitting an assertion of qualified immunity as a defense to an official-capacity suit would conflict with clear Supreme Court precedent, we presume that *Bartell* involved an assertion of qualified immunity only in the defendants' individual capacity.

A handful of other circuits have permitted private corporations to assert qualified immunity, but all of the cases were similarly unclear as to whether the suit was in the corporation's personal capacity or official capacity. *See Sherman v. Four Cnty. Counseling Ctr.*, 987 F.2d 397, 403–06 (7th Cir. 1993) (private psychiatric center); *DeVargas v. Mason & Hanger-Silas Mason Co.*, 844 F.2d 714, 723 (10th Cir. 1988) (private corporation providing security inspectors for Los Alamos National Laboratory); *Folsom Inv. Co. v. Moore*, 681 F.2d 1032, 1036–38 (5th Cir. 1982), *abrogated by Wyatt v. Cole*, 504 U.S. 158, 163–68 (1992) (private investment company).

conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "If the court can find, 'on a favorable view of the [plaintiff's] submissions,' a violation of a constitution[al] right, the next step in *Saucier*'s sequential analysis is to determine if the right was clearly established." *Leonard v. Robinson*, 477 F.3d 347, 354–55 (6th Cir. 2007) (quoting *Saucier*, 533 U.S. at 194). Although addressing both questions is "often beneficial," we are "permitted to exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

When considering whether a right is clearly established, "[t]he key determination is whether a defendant moving for summary judgment on qualified immunity grounds was on notice that his alleged actions were unconstitutional." *Grawey v. Drury*, 567 F.3d 302, 313 (6th Cir. 2009). "'[I]n an obvious case, general standards can clearly establish the answer, even without a body of relevant case law.'" *Sample v. Bailey*, 409 F.3d 689, 699 (6th Cir. 2005) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).

## C. Procedural Due Process

### 1. Animals

Pet Supply argues that the defendants-appellants violated a clearly established right to a hearing prior to the seizure of their animals. Pet Supply does not argue that the post-seizure hearing was not sufficiently prompt or otherwise did not comply with due process; it simply argues that the defendants-appellants were obliged to provide a hearing before seizing the animals.

"A fundamental requirement of due process is the opportunity to be heard. It is an opportunity which must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (internal quotation marks and citations omitted). We apply the well-known balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976), to determine if due process was afforded, and we consider: "the private interest that will be affected by the official action," "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural

safeguards," and "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

Usually, due process requires that a hearing is mandated before the deprivation of property or liberty occurs.[4] *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). However, we have held that the failure to provide a pre-deprivation hearing does not violate due process in situations where a government official reasonably believed that immediate action was necessary to eliminate an emergency situation and the government provided adequate post-deprivation process. *See Harris v. City of Akron*, 20 F.3d 1396, 1403–05 (6th Cir. 1994) (the demolition of a home without notice and a hearing did not violate due process where the building inspector believed that the home was "dangerously close" to falling onto the street and another home); *Mithrandir v. Brown*, 37 F.3d 1499, at \*2–3 (6th Cir. 1994) (table decision) (confiscation of a prisoner's typewriter without a hearing was justified by an emergency because two prison guards had been assaulted in the prior month and one had been stabbed with a part from an inmate's typewriter). And most relevant to the instant situation, in an unpublished per curiam opinion we affirmed a district court's conclusion that a government official's seizure of "marauding cattle" without a prior hearing did not violate due process. The cattle had escaped from their land and were running wild in the community: trampling gardens, eating wheat from nearby fields, running onto the road and causing car accidents, and charging at people. *Lowery v. Faires*, 57 F. Supp. 2d 483, 492–94 (E.D. Tenn. 1998), *aff'd*, 181 F.3d 102 (6th Cir. 1999) (table decision). Local officials served an impoundment notice on the farmer who owned the cattle and then seized the cattle without providing a hearing. The district court concluded that the failure to provide a pre-deprivation hearing did not violate due process where taking the time to provide a pre-deprivation hearing would leave the animals and the public exposed to an emergency

---

[4]Under *Parratt*, "[i]f an official's conduct would otherwise deprive an individual of procedural due process but is 'random and unauthorized,' the *Parratt* doctrine allows the state to avoid liability by providing adequate remedies after the deprivation occurs." *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 901 (6th Cir. 2014) (quoting *Parratt v. Taylor*, 451 U.S. 527, 541 (1981)). The *Parratt* doctrine does not present "an exception to the *Mathews* balancing test, but rather an application of that test to the unusual case in which one of the variables in the *Mathews* equation—the value of predeprivation safeguards—is negligible in preventing the kind of deprivation at issue." *Zinermon*, 494 U.S. at 129. The district court concluded that the actions of the McKamey employees were not random and unauthorized and so the *Parratt* rule does not apply to this situation; neither party challenges that conclusion on appeal.

situation. *Id.* We held that "we are not persuaded that the district court erred in granting summary judgment to defendants" and affirmed on the reasoning of the district court. *Lowery,* 181 F.3d 102. Although these cases did not apply the *Mathews* balancing test, the conclusion that the failure to provide a pre-deprivation hearing does not violate due process likely reflects that the governments' strong interest in immediately ending an emergency situation places a heavy thumb on the scale.

Applying the *Mathews* balancing test, we conclude that the seizure of the animals did not violate due process.

First, we agree with Pet Supply that an important property interest was affected by the seizure. "[T]he property interest in a person's means of livelihood is one of the most significant that an individual can possess." *Ramsey v. Bd. of Educ. of Whitley Cnty.*, 844 F.2d 1268, 1273 (6th Cir. 1988). Although Pet Supply has a strong interest in not being deprived of the income-generating animals, we note that Pet Supply was not totally deprived of its property; while Pet Supply lost control over the animals for multiple months, the animals were eventually all returned to the company.

Second, the risk of an erroneous deprivation was low due to the participation of trained animal-welfare officers in the seizure, and there is little value to additional procedural safeguards. *Compare Reams v. Irvin*, 561 F.3d 1258, 1264 (11th Cir. 2009) (holding that "the risk of an erroneous deprivation . . . was relatively low" when a veterinarian and trained inspectors observed conditions at a farm, concluded that donkeys and horses were in unsafe conditions, and removed the animals without a prior hearing), *with Siebert v. Severino*, 256 F.3d 648, 660 (7th Cir. 2001) (holding that "the risk of an erroneous deprivation . . . through the procedures used is great" when a "volunteer investigator who apparently lacked sufficient knowledge about horses to determine whether appropriate care was given" ordered the removal of horses from a home without prior notice or a hearing). Additionally, it is difficult to see the value of the additional procedural safeguard of a hearing prior to the seizure, given that Pet Supply requested a temporary restraining order in the midst of the animal seizure and its request was denied.

Finally, we conclude that there was a great governmental interest in the immediate seizure of the animals without pausing for a prior hearing. Pet Supply does not dispute that when the McKamey officials arrived, the animals had feces and urine matted in their fur, water bottles were empty, and a dead hamster was found in the cage of which its staff was unaware. Pet Supply does not dispute that the temperature was at or above eighty-five degrees for the entirety of the McKamey employees' time at the store and that the air conditioner had been broken for weeks. Pet Supply explained that the state of affairs was the result of the McKamey employees arriving while Pet Supply workers were in the midst of their daily cleaning routine, but Pet Supply has not introduced any evidence that the degree of filth was normal, nor has Pet Supply disputed the evidence that its employees arrived over an hour before the McKamey employees arrived and that the employees had not provided food or water to the animals during that time. As in *Lowery v. Faires*, the government has a strong desire to eliminate immediately a situation that posed a danger to the animals. Additionally, Pet Supply received a hearing in city court nine days after the seizure on the violations of city animal code and the city court had the power to order the return of the animals. *Cf. Flatford v. City of Monroe*, 17 F.3d 162, 165, 169–71 (6th Cir. 1994) (although a reasonable building inspector could conclude that an immediate threat to the safety of residents existed given severe "dilapidation and disrepair" and conditions that posed "an immediate risk of electrocution or fire" that justified evacuation and demolition without a prior hearing, the failure to provide any post-deprivation hearing violated a clearly established constitutional right).

On balance, given the low risk of an erroneous deprivation and the minimal value of additional safeguards, the great governmental interest in immediately removing the animals from an overly hot, filthy environment, and the fact that a hearing was provided nine days later, we conclude that the seizure of the animals did not violate due process.

Because the seizure of the animals without a prior hearing did not violate due process, Walsh and Nicholson are entitled to qualified immunity on this claim.

**2. Permit**

Pet Supply also argues that the revocation of its pet dealer permit without a prior hearing violated a clearly established due-process right.  The parties agree that Pet Supply had a protected property interest in the permit.

Pet Supply alleges that McKamey and Walsh revoked the permit.  R. 1 (Compl. at ¶ 60, 62, 64) (Page ID #11, 12).  Pet Supply does not allege that Nicholson played any role in the permit revocation.  Accordingly, Nicholson is entitled to qualified immunity on this claim.

We conclude that the revocation of the permit violated due process.  The City Code authorized the revocation of a permit "if negligence in care or misconduct occurs that is detrimental to animal welfare or to the public."  R. 70-4 (City Code at 25) (Page ID #1513).  After McKamey revoked Pet Supply's permit, Pet Supply never had an opportunity—either pre-deprivation hearing or post-deprivation—to challenge the permit revocation.  Pet Supply could challenge the citations for violations of animal-welfare laws in city court, but the city court did not have authority over the permit and could not order the reinstatement of the permit.  R. 69-12 (City Court Order at 3 n.1) (Page ID #1370) ("[t]he court is [ ] of the opinion the City Court has no authority to revoke or make any order relative to the license of the Pet Company.").  It was the policy and practice of McKamey and the City of Chattanooga to require an individual or company whose permit was revoked to apply for a new permit.  R. 69-9 (7/21/2010 Hr'g Tr. at 113–16) (Page ID #1350–53).  This process does not truly allow for a reinstatement of the permit; even if the City Court were to conclude that the permit holder had not violated the City Code, the permit holder was nonetheless required to apply for a new permit, pay the fee, and go through the inspection process again.  The fact that the permit holder can ultimately obtain a new permit after jumping through various hoops does not address the lack of a mechanism to challenge the initial revocation.

Due process requires an opportunity to be heard at a "meaningful time and in a meaningful manner."  *Armstrong*, 380 U.S. at 552.  The failure to provide a hearing prior to a license or permit revocation does not per se violate due process.  *See Barry v. Barchi*, 443 U.S. 55, 65–66 (1979) (holding that the summary suspension of a horse trainer's license without a prior hearing did not violate due process, but the failure to provide a timely post-suspension

hearing did violate due process). But there is no dispute that *never* providing an opportunity to challenge a permit revocation violates due process. Thus, the revocation of Pet Supply's permit without a pre-deprivation hearing or a post-deprivation hearing violated due process.

No reasonable officer could believe that revoking a permit to do business without providing any pre-deprivation or post-deprivation remedy was constitutional. Walsh argues that she was entitled to rely on the constitutionality of the Chattanooga City Code, which does not provide for a hearing on the revocation of a pet-dealer permit. Certainly, there are policy reasons that counsel in favor of allowing government officials to presume the constitutionality of statutes and ordinances. *See Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979). But the Chattanooga City Code does not make the revocation of the permit automatic upon the determination that negligence or misconduct has occurred. The Code states that an animal-related permit "*may be* revoked if negligence in care or misconduct occurs that is detrimental to animal welfare or to the public." R. 70-4 (City Code at 25) (Page ID #1513). The Code did not tie Walsh's hands; it was her discretionary decision immediately to revoke the permit.

This is one of the rare situations where the unconstitutionality of the application of a statute to a situation is plainly obvious. In *Leonard v. Robinson*, 477 F.3d 347 (6th Cir. 2007), we denied qualified immunity to a police officer in a § 1983 suit alleging First Amendment violations because there was no probable cause to support arresting an individual for uttering "God damn" at a township board meeting. *Id.* at 359–60. We rejected the police officer's argument that various Michigan statutes supported probable cause because we concluded that "no reasonable police officer would believe that any of the three other Michigan statutes relied upon by the district court are constitutional as applied to [the individual's] political speech during a democratic assembly." *Id.* Similarly, here, no reasonable officer could believe that revoking this permit without providing any opportunity for a hearing was constitutional. Accordingly, the evidence taken in the light most favorable to Pet Supply demonstrates the violation of a clearly established right, and so we deny qualified immunity to Walsh on this claim.

## D. Fourth Amendment

Pet Supply next argues that the warrantless seizure of its animals and business records violated a clearly established Fourth Amendment right. The Fourth Amendment of the United States Constitution protects citizens from unreasonable searches and seizures. "A 'seizure' of property, [the Supreme Court has] explained, occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'" *Soldal v. Cook Cnty.*, 506 U.S. 56, 61 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). The protections of the Fourth Amendment are not limited to criminal investigations. *See New Jersey v. T.L.O.*, 469 U.S. 325, 335 (1985). No one disputes that dispossessing Pet Supply of its animals and business records is a seizure of property within the meaning of the Fourth Amendment. The only issue is whether the warrantless seizure of the animals and records violated a clearly established Fourth Amendment right.

The Fourth Amendment is a powerful background norm that prohibits government officials from engaging in a warrantless search or seizure, with limited exceptions. "[A] search or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances,'" *Coolidge v. New Hampshire*, 403 U.S. 443, 474–75 (1971), or another of the carefully delineated exceptions to the warrant requirement. The defendants-appellants argue that the warrantless seizure of the animals and business records was justified by the plain-view and exigent-circumstances doctrines. Thus, we must "evaluate whether 'an objectively reasonable officer confronted with the same circumstances could reasonably believe that exigent circumstances existed.'" *Kovacic v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 724 F.3d 687, 695 n.1 (6th Cir. 2013) (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002)).

Under the plain-view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). Generally, the lawful-right-of-access requirement obliges a government official to "get a warrant if possible before he seizes an item in plain view. He

cannot seize absent exigent circumstances.  If he could obtain a warrant, then . . . he cannot use the 'plain view' exception for the evidence." *United States v. McLevain*, 310 F.3d 434, 443 (6th Cir. 2002).

Under the exigent-circumstances doctrine, there must be a "'need for prompt action by government personnel, and [a conclusion] that delay to secure a warrant would be unacceptable under the circumstances.'" *Kovacic*, 724 F.3d at 695 (quoting *United States v. Rohrig*, 98 F.3d 1506, 1517 (6th Cir. 1996)).  Classic examples of exigent circumstances that may justify a warrantless property seizure include the likelihood that a suspect will destroy evidence, *see Illinois v. McArthur*, 531 U.S. 326, 331–32 (2001), and when there exists "'the need to assist persons who are seriously injured or threatened with such injury,'" *Kovacic*, 724 F.3d at 695 (quoting *Johnson v. City of Memphis*, 617 F.3d 864, 868 (6th Cir. 2010)).

### 1. Animals

We conclude that the warrantless animal seizure did not violate the Fourth Amendment. As discussed *supra*, it is undisputed that the animals were dehydrated and in high heat and without water, that one hamster had a large cut that had not received medical care, and that the Pet Supply employees were unaware that a hamster had died in its cage.  A reasonable officer could believe that this constituted neglect under the Chattanooga City Code[5] and that the conditions justified the warrantless seizure of the animals.  Unlike in *Kovacic*, where exigent circumstances did not justify the warrantless seizure of a child from a home based on "reliance on weeks-old incidents" and the fact that the child's mother had missed a meeting, here, the

---

[5]Chattanooga City Code § 7-28(a) makes it "unlawful for any person to neglect an animal as neglect is defined in this Chapter."  R. 70-4 (City Code at 21) (Page ID #1509).  "Neglect" is defined in § 7-2 as:

> (1)   Failing to sufficiently and properly care for an animal to the extent that the animal's health is jeopardized;
> (2)   Failing to provide an animal with adequate living conditions as defined in this chapter (adequate feed, adequate water, adequate shelter, adequate space, etc.);
> (3)   Failing to provide adequate veterinary care;
> (4)   Keeping any animal under conditions which increase the probability of the transmission of disease;
> (5)   Failing to provide an adequate shelter for an animal;
> (6)   Negligently allow any animal, including one who is aged, diseased, maimed, hopelessly sick, disabled, or not ambulatory to suffer unnecessary neglect, torture, or pain; or
> (7)   Meeting the requirements of the definition of an Animal Hoarder.

R. 70-4 (City Code at 8–9) (Page ID #1496–97.

conditions of the store created an imminent and ongoing danger to the health of the animals. *Cf. Siebert*, 256 F.3d at 657–58 (concluding that exigent circumstances did not justify the warrantless seizure of horses because standing in a muddy pasture, drinking from streams, and being exposed to cold temperatures do not constitute exigent circumstances). Given the high heat and squalid conditions in which the animals were found, on June 15, 2010, a reasonable official could believe that the exigent circumstances justified the warrantless seizure of the animals. Accordingly, Walsh and Nicholson are entitled to qualified immunity on this claim.

### 2. Business Records

Pet Supply asserts that the warrantless seizure of business records "including the store operations manual, employee handbook, animal logs, animal health certificates, veterinary treatment records, pedigree records, and transportation records," R. 1 (Compl. at ¶ 58) (Page ID #11), violated the Fourth Amendment. Because Pet Supply does not allege or present any evidence that Nicholson removed business records, it has not demonstrated that he violated a constitutional right, and so Nicholson is entitled to qualified immunity on this claim. Pet Supply alleges that Walsh seized the records. R. 74 (Memo. Summ. J. at 5) (Page ID #2066). Walsh is not entitled to qualified immunity on this claim because no reasonable officer could conclude that the plain-view doctrine or exigent circumstances justified the warrantless seizure of the business records.

The defendants-appellants do not even attempt to argue that the very nature of the records was incriminating, so the seizure was not justified by the plain-view doctrine.

Nor is the seizure of the records justified by the exigent-circumstances doctrine. There is no evidence in the record that the seized business records provided evidence of a crime or other legal violation, or that the McKamey employees feared destruction of the evidence. *See United States v. Plavcak*, 411 F.3d 655, 662–65 (6th Cir. 2005) (exigent circumstances justified warrantless seizure of documents providing evidence of an alien smuggling and fraud ring when police came upon defendants burning other documentary evidence). The business records obviously do not pose a danger to anyone's health or safety. To the extent that the defendants-appellants needed information about the animals to care for them properly, that need was

satisfied by obtaining photocopies of the animals' records from Pet Supply employees.  R. 67-1 (Hurn Aff. at ¶ 13) (Page ID #1207–08).

There is no pre-2010 caselaw that disrupts the presumption that the Fourth Amendment applies to the seizure of business records.  No reasonable officer could have concluded that the seizure of the business records was justified by an exception to the warrant requirement.  Accordingly, the seizure violated a clearly established Fourth Amendment right, and so Walsh is not entitled to qualified immunity on this claim.

## III.  CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's entry of summary judgment in part and **AFFIRM** in part and **REMAND** for further proceedings consistent with this opinion.